MARGARET C. INMAN *et al. v.* R. P. TUCKER *et al.*

(*Nashville.* December Term, 1917.)

1. **EVIDENCE.** Degree of secondary evidence. Copies made from copy. Assessment book.

On ejectment, bill to recover land, where the book from which copies of the assessment of part of the land were made was not the original assessment book, such copies were inadmissible in evidence. (*Post, pp.* 517-519.)

Acts cited and construed: Acts 1843-44, ch. 103; Acts 1859-60, ch. 9.

Case cited and approved: Boughton v. State, 26 Tenn., 193.

Code cited and construed: Secs. 597-602 (1858).

2. **TAXATION.** Sale. Validity of tax deed. Sheriff as collector of taxes. Statute.

Under Acts 1859-60, chapter 9, providing there shall be elected in each county by the qualified voters a revenue collector who shall hold office for two years, and that should any collector die, resign, or remove from the county before expiration of his term, the vacancy shall be filled by the county court, who shall elect a revenue collector to serve until the next regular election, etc., a person elected sheriff in place of one resigned, and who never attemped to qualify as revenue colector, the countycourt having elected a new collector in place of the incumbent resigned, was not the collector, so that tax deed executed by him, reciting that the order of sale came to his hands as sheriff and tax collector, was void. (*Post, p.* 519.)

3. **TAXATION.** Sale. Validity of tax deed. Statute.

Under Code 1858, section 662, providing that the tax collector may sell land for taxes due and unpaid, and make titles at any time within two years from expiration of his term of office, where a tax sale was made July 1, 1861, but tax deed was not executed until October 6, 1861, when the sheriff who sold the

Inman v. Tucker.

property was neither collector nor sheriff, though he described himself in the deed as acting in both capacities, such tax deed was void; the sheriff's term of office having expired more than two years prior to the execution of the deed. (*Post, p.* 520.)

Acts cited and construed: Acts 1855-56, sec. 3.

Case cited and approved: Hightower v. Freedle, 37 Tenn., 312.

Code cited and construed: Sec. 662 (1858).

4. TAXATION. Tax sales. Recitals of void tax deed. Evidence.

The recitals of a void tax are competent as evidence. (*Post, pp.* 520, 521.)

5. STATUTES. Repeal by implication.

Statutes relating to a given matter are repealed by necessary implication by subsequent statutes relating to the same matter, where there is a plain antagonism between the two systems. (*Post, pp.* 521-527.)

6. ADVERSE POSSESSION. Scope of possession. Land actually claimed.

Where persons living on land each claimed the particular land on which he erected his improvements, understanding each was holding for himself under the terms of a deed of the whole tract to their grantor, which was conditioned that he convey five hundred acres to each of them, and understanding that each was to have a deed to his particular land, each making his improvements on the land to which he expected to receive deed and to which he afterwards did receive deed, the occupancy of each of the persons was on his own account and in his own right, and after lapse of seven years gave a possessory right to the land actually claimed. (*Post, pp.* 527-529.)

Cases cited and approved: Redmond v. Bowles, 37 Tenn., 547; Sullivan v. Ivey, 34 Tenn., 487; Beard v. Bricker, 32 Tenn., 50; James v. Patterson's Lessee, 31 Tenn., 309; Fair v. Headrick, 44 Tenn., 334.

Cases cited and distinguished: Ellege v. Cooke, 73 Tenn., 630; Slatton v. Tennessee Coal Co., 109 Tenn., 425.

7. FRAUDS, STATUTE OF. Possession under parol donation.

Where one goes into possession under a parol donation, he occupies

138 Tenn.—33

Inman v. Tucker.

the same relation in respect to his possesion as a purchaser by parol. (*Post, pp.* 529-533.)

Cases cited and approved: O'Neal v. Breechen, 64 Tenn., 605; Haynes v. Jones, 39 Tenn., 373; Keys v. Keys, 58 Tenn., 430; Jordan & Ransom v. Maney, 78 Tenn., 145; Moore v. Burrow, 89 Tenn., 104; Kittel v. Steger, 121 Tenn., 410.

Case cited and distinguished: Bailey v. Henry, 125 Tenn., 402.

---

FROM VAN BUREN.

---

Appeal from the Chancery Court of Van Buren County.—W. B. GARVIN, Chancellor, sitting by interchange.

BROWN, SPURLOCK & BROWN, F. H. MERCER, JAS. M. BRADY and E. N. HASTON, for appellants.

ROBINSON & FANCHER, for appellees.

MR. EVANS, Special Judge, delivered the opinion of the Court.

This was an ejectment bill filed by complainants against defendants in the chancery court of Van Buren county to recover certain lands described in the bill.

The chancellor entered a decree in favor of the complainants, from which decree defendants have appealed to this court and assigned errors. The tracts of land sued for are as follows:

First. The Eliza Simms grant, No. 5769, issued by the State of Tennessee to Eliza Simms on January 12, 1838, embracing five thousand acres.

Second. The Francis Church grant, No. 2426, issued by the State of Tennessee to Francis Church on March 24, 1832.

Third. Three hundred acres out of the Isaac Hinkle grant, No. 4765, issued by the State of Tennessee to Isaac Hinkle on September 26, 1836.

The complainants claim a perfect chain of title to the land described from the State of Tennessee down to themselves.

The defendants claim the Eliza Simms grant, by virtue of a tax sale, and by virtue of adverse possession. They also claim the J. H. Walling five thousand acre grant, No. 5245, issued May 25, 1837, which laps on and covers a portion of the Church grant claimed by complainants. The Walling grant is younger than the Church grant, and defendants claim to have defeated the Church title by adverse possession. Defendants also claim a portion of the Isaac Hinkle grant, but there is practically no controversy in this court with reference to that grant.

The real controversy in the lawsuit involves the following propositions:

(1) Is the tax sale of the Eliza Simms grant, under which defendants claim, valid or void?

(2) Have the defendants had possession of the Eliza Simms grant such as would defeat the title of complainants?

(3) Have the defendants had such possession of the J. H. Walling five thousand-acre tract as would defeat complainants' title to that portion of the Francis Church land that interferes with the Walling grant?

The tax deed to the Simms grant, under which defendants claim, was dated October 6, 1866, and was executed by William Sparkman, as sheriff and tax collector, to Hiram Gilbert. The tax deed recites that a judgment was rendered on the 7th day of April, 1861, in the circuit court of Van Buren county for $5.40, for taxes, costs, and charges due and unpaid for the year 1860, against a tract of land of which Eliza Simms was the reputed owner, containing five thousand acres. It further recites that on this judgment "an order of sale issued and came to the hands of William Sparkman, sheriff and tax collector of the county of Van Buren for the year 1861, by virtue of which, after advertising and giving notice agreeable to law, the within Sparkman sold said land at the courthouse door of said county on the first Monday of July, 1861, at public sale, to Harmon Walling, for the sum of $5.40." The tax deed further recites that this was the highest and best bid, and that said Harmon Walling directed title to be made to Hiram Gilbert. This deed was recorded in the office of the register of Van Buren county in "Deed Book D, p. 19."

A number of attacks have been made by complainants upon this tax sale. Their first contention is that the sale is void because the assessment was not in compliance with the law; that it contained an insufficient de-

scription of the land; that the land was listed to Eliza "Semms" and not Simms; that the land is valued at "500" without the dollar mark; and that the taxes are fixed at "157" without a dollar mark.

Several copies of assessment of the Simms land for the year 1860 were introduced, but we think, as did the chancellor, that the book from which these copies were made was not the original assessment book. Defendants' exceptions to these copies were sustained in the lower court, and in this action we think the chancellor was correct.

We are of opinion, however, that the tax deed was void for the following reasons:

(1) Because William Sparkman was not the tax collector at the date of the alleged sale, and was not clothed with authority to make such sale. Under sections 597-602 of the Code of 1858, which were taken from chapter 103 of the Acts of 1843-44 (construed by this court in *Boughton* v. *State,* 7 Humph., 193), the county court at its January term each year was authorized to elect a collector of taxes, but if the county court failed at that time to elect a collector, then it was provided the sheriff should be collector. So that each year it was contingent until after the January term of the county court whether the sheriff would or would not be the collector of revenue.

The legislature, however, on December 15, 1859, changed this system entirely and took away from the county court the discretion as to whether it would elect a revenue collector, and vested the election of that

officer in the people, provided for a term of office of two years, and expessly provided that in the event of the death of the collector, or his resignation, that his successor should be elected by the county court, and should fill out the unexpired term of office. This system was provided by chapter 9 of the Acts of 1859-60, the first three sections of which act are as follows:

"Section 1. Be it enacted by the general assembly of the state of Tennessee, that there shall be elected in each county in this State, by the qualified voters thereof, a revenue collector, who shall hold his office for two years from the date of his qualification.

"Sec. 2. Be it further enacted, that the first election for a revenue collector, under the provisions of this act, shall be held on the first Saturday in March next, and elections for said officers shall ever afterwards be held at the same times and places that elections are held for the election of sheriffs.

"Sec. 3. Be it further enacted, that should any revenue collector die, resign, or remove from the county before the expiration of his term of office, the vacancy thus created shall be filled by the county court, who shall elect a revenue collector to serve until the next regular election thereafter, and who shall execute the bonds, be subject to all the liabilities, and enjoy all the emoluments of the revenue collector, elected by the people."

It will be observed that under chapter 9 of the Acts of 1859-60, above quoted, there was no provision for the sheriff ever to be revenue collector. The tax deed, however, recites that on a judgment of the circuit court in

favor of the State of Tennessee, an order of sale issued and came to the hands of William Sparkman, sheriff and tax collector of the county of Van Buren. Now the facts are that under the provisions of chapter 9 of the Acts of 1859-60, one Harmon York was elected revenue collector for Van Buren county in the year 1860 at the March election, and that he qualified as such collector at the April term of the county court in the same year. In the same election one William A. Steakley was elected sheriff of Van Buren county, and qualified as such at the April term of the county court. At a quorum session of the county court held on the first Monday in June (June 3, 1861), Harmon York resigned as tax collector, and James Sparkman was elected to that office in his place and stead. Likewise on the same day William A. Steakley resigned the office of sheriff, and William Sparkman was elected sheriff in his place and stead. William Sparkman immediately on the day of his election qualified as sheriff by giving bond and taking the oath as required by law. But James Sparkman did not qualify as collector until the July term of the court held on the 1st day of July, 1861. Upon that day he gave bond and took the oath as required by law. James Sparkman after his qualification occupied the office of revenue collector for the remainder of the year 1861. William Sparkman, who was elected sheriff upon the resignation of Steakley, never did qualify or attempt to qualify as revenue collector, and the purported sale of the Eliza Simms tract is the only act which the record shows William Sparkman ever attempted to perform in the capacity of revenue collector.

We are therefore of opinion that William Sparkman was not collector of taxes on the first Monday of July, 1861, the date of the purported tax sale. In fact, on that very day James Sparkman had qualified as tax collector, and was the tax collector of Van Buren county.

(2) The tax deed is void for the further reason that while the purported tax sale was made July 1, 1861, the tax deed was not executed until October 6, 1866. At that time William Sparkman was neither collector nor sheriff. His term of office had expired more than four years prior to the execution of the deed. At the time the tax deed was executed, James Hunter was sheriff, and Samuel Johnson was revenue collector. Prior to 1856, sheriffs and revenue collectors had no power to make deeds after they went out of office. *Hightower* v. *Freedle,* 5 Sneed, 312. In chapter 91 of the Acts of 1855-56, section 3, carried into the Code of 1858 as section 662, it was provided as follows, with reference to the tax collector:

"662. He may sell lands condemned by the circuit court for taxes due and unpaid, and make titles to the same, at any time within two years from the expiration of his term of office; and if he fail or neglect to sell such land, then it shall be sold by his successor."

We therefore think that if Sparkman was tax collector in 1861, and in fact made the sale, he could not make the deed after he went out of office, unless he made it within two years of the expiration of his term of office. The record shows that in March, 1862, one W. C. Haston was elected sheriff and Daniel Dodson was elected

revenue collector. Since this tax deed was executed by William Sparkman at a date more than two years from the expiration of his term of office, we think it is void. Since it is void, its recitals are not competent as evidence, and without it there is no evidence in the record that the judgment condemning the Simms tract to sale was ever carried into execution.

It is insisted by counsel for defendants that upon the resignation of Harmon York as tax collector, William Sparkman, the newly elected and qualified sheriff, became tax collector by virtue of sections 597-598 of the Code, but this contention is unavailing for four reasons:

First, because these two sections of the Code were repealed by chapter 9 of the Acts of 1859-60 above quoted by necessary implication; there being a plain antagonism between the two systems.

Second, even if sections 597-598 of the Code were in force, and were applicable to a case where a revenue collector had been elected but had resigned, still the sheriff became revenue collector only in the event the county court failed to elect a new collector. The record in this case affirmatively shows that the county court elected a successor to Harmon York immediately upon receipt of his resignation.

Third, William Sparkman never qualified as revenue collector.

Fourth, even assuming that William Sparkman was tax collector as well as sheriff at the date of the sale, the deed was void, as above stated, for the reason that it was not executed until 1866, more than two years after his term of office had expired.

Complainants show a good record title in themselves (1) to the Simms grant which was also claimed by defendants under the tax deed above held to be void; (2) to the Church grant, which is admitted to be superior to the Walling grant under which the defendants claim; (3) to the three hundred-acre tract within the Hinkle grant. Upon this state of the record title, defendants' rights rest alone upon their claim of adverse possession.

The oldest possessions on the land in controversy relied upon by the defendants are known as the C. G. Miller improvements, the John J. Miller improvements, and the Mary Wells or Henry Davis improvements. All of these are within the boundary of the Eliza Simms grant, No. 5769. These possessions came about as follows: On October 1, 1868, Hiram Gilbert executed a certain deed to one E. P. Gilbert, which was duly recorded in the office of the register of Van Buren county on December 10, 1868. The lands described in this deed were the Eliza Simms grant, No. 5769, of five thousand acres, and the J. H. Walling grant, No. 5245, also of five thousand acres. The deed conveyed one thousand acres within the boundaries described to E. P. Gilbert, individually. Out of the Eliza Simms grant, the deed reserved to the grantor one thousand five hundred acres "lying on the northern portion thereof, and in one piece, and extending all the way across" that grant. The other seven thousand five hundred acres described in the deed were conveyed to E. P. Gilbert upon the following condition:

"That is the said party hereto of the second part (E. P. Gilbert) hereby covenants and agrees to and with the said party of the first part (Hiram Gilbert, the grantor), that he the said party of the second part, his heirs or life representatives, shall and will for the nominal consideration of one dollar convey unto each of the hereinafter named persons, children of one Philena Miller, who is now a resident of Wayland in the county of Aligan and State of Michigan, also to the children of Juliett Wilcox, now deceased, late resident of Lutton in the State of New York, and also to the children of Lydia Jane Perry, decd., formerly of Lutton as aforesaid, five hundred acres of the land herein expressed and intended to be conveyed, to each and every one of them that will enter upon, take possession of, use, occupy and commence cultivating the herein intended to be granted to them at any time within five years from the date hereof, and continue in possession of and use, occupy and cultivate lands so occupied during and for the full term of five years from the time of taking such possession or occupation of the lands hereby intended to be conveyed to them as follows, viz:

"To William Lee Miller, Charles G. Miller, John J. Miller, Mary C. Wells, Margaret Ann Baird, Martha O. Miller, Jane Lovina Lashley, Christa Morton Atwood, John Wilcox, Lydia Downey, Jeremiah Wilcox, Mary E. Perry, Charles A. Perry, and Alice Perry, and it is covenanted, agreed and understood by and between all the parties hereto and herein named, that in case any one or all the above named children of Philena Miller,

Juliett Wilcox and Lydia Perry should refuse to enter upon, take possession of, use, occupy and cultivate said lands intended for him, her or them within the said five years before mentioned, or in case any or either of them should take possession of said lands and fail to remain in possession of or to use, occupy and cultivate the same, or remove therefrom or offer to sell said lands at any time during the five years that they or either of them are required to remain thereon, and cultivate the same, without first consulting and getting the consent and approval of the said Hiram Gilbert, party hereto of the first part, his heirs or legal representatives, then and in that case the lands so intended for him, her or them so refusing to occupy as above expressed, shall revert back to the said Hiram Gilbert, his heirs or legal representatives, to his and their own proper use, benefit and behoof forever, and this conveyance or any other conveyance made or to be made by virtue of the above mentioned covenant shall be declared and is null and void and of no effect so far as relates to him, her or them so refusing to occupy said lands as above expressed, and each and every deed to be made by virtue of the within indenture shall contain a reversion, and also a mineral reservation clause the same as those herein contained, and in case the before mentioned Mary C. Wells, Margaret Ann Baird, Martha O. Miller, Alice P. Miller, Lydia Downey, Christa Morton Atwood, Mary E. Perry and Alice Perry, or either of them, shall elect to enter upon, possess, occupy and cultivate the lands hereby intended for

them, then and in that case the said party hereto of the second part, his heirs or legal representatives, shall make or cause to be made a deed of conveyance, conveying in fee to each and every one of them who shall so elect to occupy said lands and continue thereon as above expressed five hundred acres of the land hereinafter described to her own sole and separate use and the same shall not be subject to the disposal of her husband, nor liable for any of his debts, any law of the State to the contrary thereof notwithstanding in which said lands are situated, and the lands hereby intended to be conveyed, may be known and located, and are situated, lying and being in district No. 7, in the county of Van Buren, in the State of Tennessee, and are described as follews.''

Pursuant to the provisions of this deed, about the year 1871 or 1872, C. G. Miller, J. J. Miller, and Mary Wells moved on the Eliza Simms tract of land and built and maintained improvements on what is known in the record as the C. G. Miller five hundred-acre tract, the J. J. Miller five hundred-acre tract, and the Mary C. Wells five hundred-acre tact, otherwise known as the Henry Davis tract. E. P. Gilbert afterwards executed deeds to these parties as follows: In 1880 a deed to Henry Davis and others for the Wells or Davis five hundred acres; in 1884 a deed to J. J. Miller for his five hundred acres; and also in 1884 a deed to C. G. Miller for his five hundred acres.

The record shows that these parties maintained their improvements for more than seven years prior

to receiving their deeds from E. P. Gilbert, and it is contended by the defendants that during this period the Millers and Mrs. Wells held the land as tenants of Hiram Gilbert, so as to perfect Hiram Gilbert's title to the entire Eliza Simms grant under the recorded tax deed from William Sparkman to Hiram Gilbert, executed in 1866. The complainants on the other hand contend that the relation created between Hiram Gilbert and E. P. Gilbert on the one hand, and C. G. Miller, J. J. Miller, and Mrs. Wells on the other, was not that of landlord and tenant, but that of vendor and purchaser (donor and donee); and that the Millers and Mrs. Wells when they entered upon their respective lands held for themselves alone as purchasers, and not as tenants of Hiram Gilbert. It is further contended by complainants that the five hundred acre tracts entered upon by C. G. Miller, J. J. Miller, and Mrs. Wells, respectively, were surveyed and the lines of each tract definitely established before the respective parties took possession thereof and erected their improvements thereon, and that each of these parties claimed no further than his or her particular five hundred acre tract, and not to the limits of the entire Eliza Simms grant. The defendants, however, insist that these respective five hundred-acre tracts were not surveyed at the time the parties took possession, but that the lines thereof were first established only a short time before the deeds were executed from E. P. Gilbert to the Millers and Mrs. Wells, respectively.

Inman v. Tucker.

A great deal of testimony was taken as to when these three five hundred-acre tracts were surveyed, and the proof is very much in conflict. It is certain that the line between the J. J. Miller five hundred acres and the C. G. Miller five hundred acres was surveyed and established prior to 1871 or 1872, when the improvements were erected thereon. The two Millers were unmarried at that time, and they built a house to be occupied by them jointly, and desired to build it across the line between their two tracts of land, so that the improvements might be upon both of their five hundred acre tracts. It is also beyond dispute in the record that this line between the C. G. Miller five hundred acres and the J. J. Miller five hundred acres was at one time run to the cast end thereof in order to locate the tract of a Mrs. Lashley so that she might know where to bury her husband. Two competent surveyors found the lines and marks of the original survey of the C. G. Miller, J. J. Miller, and Mrs. Wells' tracts. They cut out blocks from these original lines, and by counting the rings upon the marks testified that these marks were made and the lines were run about 1869 or 1870. While there is a great deal of testimony introduced as to when the original survey was made, much of which is very conflicting, we think, under the preponderance of the evidence, that the five hundred acre tracts were surveyed out and the lines established before the Millers and Mrs. Wells took possession and erected their improvements.

But even if this were not true, we think each of the respective parties claimed the particular land upon

which he erected his improvements. We think the parties understood that they were holding for themselves under the terms of the deed from Hiram Gilbert to E. P. Gilbert, and understood that each was to have a deed to his particular land. They did not make their improvements upon the Simms land generally, but each made his improvements upon the land to which he expected to receive a deed, and to which he did afterwards actually receive a deed.

The record shows that beginning about the year 1873, each of the parties was assessed with five hundred acres of land, and each paid taxes on five hundred acres. It further shows that neither the Millers nor Mrs. Wells ever paid any rent to any one, but enjoyed the use of their respective lands for themselves. We therefore think that the occupancy of each of these parties was on his own account alone and in his own right.

The difference between the relation of landlord and tenant and that of vendor and vendee is fully stated by Judge CARUTHERS in *Redmond* v. *Bowles,* 5 Sneed, (73 Tenn.), 630, this court said:

"The relation of one who enters into the possession of land under a contract of purchase, though verbal, is in almost every respect unlike that between tenant and landlord. The former, in point of fact, enters to hold exclusively for himself; he is neither to render rent or other service, nor is he to restore possession of the premises to the seller; he is under none of the positive obligations of a tenant by actual contract."

And in *Slatton* v. *Tennessee Coal Co.,* 109 Tenn., 425, 75 S. W., 928, it was said:

"Moreover, under the uniform holding of this court, during the currency of the parol contract and until it is repudiated, the vendee in possession holds for himself, and not as tenant of the vendor. *Redmond* v. *Bowles,* 5 Sneed, 551 [73 Am. Dec., 153]; *Sullivan* v. *Ivey,* 2 Sneed, 487; *Beard* v. *Bricker,* 2 Swan, 50; *James* v. *Patterson's Lessee,* 1 Swan, 309, 55 Am Dec., 737; *Fain* v. *Headrick,* 4 Cold., 334."

And where one goes into possession under a parol donation he occupies the same relation in respect to his possession as a purchaser by parol. In *Bailey* v. *Henry,* 125 Tenn., 402, 143 S. W., 1127, it was said:

"Plaintiff insists that a parol donee of land does not, in legal contemplation, stand upon a parity with a parol vendee, and that the decisions we have noticed have no application to this case, because, as he says, the cases referred to were based upon equitable considerations. We cannot assent to this proposition."

In that case this court quotes with approval the following from Blackstone:

" 'Purchase, indeed, in its vulgar and confined acceptation, is applied only to such acquisitions of land as are to be obtained by way of bargain and sale for money, or some other valuable consideration; but this falls far short of the legal idea of purchase, for if I give land freely to another, he is in the eyes of the law a purchaser, and falls within Littleton's definition for he comes to the estate by his own agreement; that is, he consents to the gift.' "

138 Tenn.—34

The court then says:

"Now, to say that the act of the donor in speaking the words of gift, which authorize the act of entry into possession by the donee, and that the act of the donee, in entering under the parol gift are acts void in law and to be treated as if they had not been done, is going beyond any requirement of the statute of frauds, and beyond the legal effect of its provisions.

"It is well settled that these acts of the donor and donee, viz. the parol gift and the consequent entry and continuance of adverse possession by the donee, do by the lapse of seven years ripen into a defensive right to the land in the donee, which is good against the donor or his heirs. *O'Neal* v. *Breechen,* 5 Baxt., 605; *Haynes* v. *Jones,* 2 Head, 373; *Keys* v. *Keys,* 11 Heisk., 430, 431; *Jordan & Ransom* v. *Maney,* 10 Lea, 145, 146; *Moore* v. *Burrow,* 89 Tenn., 104, 17 S. W., 1035; *Kittel* v. *Steger,* 121 Tenn., 410, 117 S. W., 500, and other authorities there cited."

We are of opinion that the possession of the Millers and Mrs. Wells up to the time they received their deeds did not perfect the title of Hiram Gilbert to the Simms grant, but only gave to each of said parties, after the lapse of seven years a possessory right to the land which he had actually inclosed, and that the continued possession of the parties for seven years subsequent to the execution of their deeds perfected the title of each to the extent of the boundaries set out in his deed. Complainants do not seek to recover these five hundred acre tracts but concede that the title

thereto has, by adverse possession, been perfected in the parties holding them.

The defendants rely upon several other possessions, known in the record as the Hiram Gilbert, Jr., possession of an acre and a quarter; the Buck and Tom Walling possession; the Gaul extension of the Baldwin orchard; the Haston-Beech possession; and the Haston wire lot.

The first of these involves a possession made by Hiram Gilbert, Jr., about 1858, on grant No. 3687, to which he had title. He was a federal soldier, and was killed about 1862 or 1863, leaving brothers and sisters surviving him. He left no will. At his death he left certain persons in charge of the possession and premises above mentioned, and they held the same claiming under Hiram Gilbert, Jr., as late as 1881. Hiram Gilbert, Sr., died in 1871, leaving a will in which his real estate was devised to his children. This possession made by Hiram Gilbert, Jr., on grant No. 3687, extended an acre and a quarter over on the J. H. Walling five thousand acre grant, No. 5245, which interferes to some extent, at this point, with the Church grant. This same acre and a quarter is also embraced in grant No. 12315 of two hundred acres owned by Hiram Gilbert, Jr., which grant 12315 lies wholly within the boundaries of the J. H. Walling grant, some of the lines of the two grants being in common; but the J. H. Walling grant is the older of the two. Defendants' contention is that this acre and a quarter extension of the Hiram Gil-

bert, Jr., possession perfected the Hiram Gilbert, Sr.,
title to the J. H. Walling grant, and hence to that por-
tion of the Church grant which interferes therewith;
while complainants insist that it only perfected Hiram
Gilbert, Jr.'s, title to the two hundred acre grant No.
12315, which he claimed as his own. We think, under
the facts of this record, the contention of the complain-
ants must be sustained. We also think defendants'
contention as to this possession is precluded by the
partition deed made in 1888 between Wicks, Gaul, and
others, heirs of Hiram Gilbert, Sr., and Hiram Gilbert,
Jr., and the deed fom Wicks to defendant R. P. Tuck-
er of July 20, 1907, in both of which the two hundred
acres (grant No. 12315) was recognized as excluded
from the J. H. Walling five thousand acres, and the
title thereto superior to the J. H. Walling grant. It
was further recognized and cited in the partition deed
that the title to this two hundred acres came to the par-
ties by inheritance from Hiram Gilbert, Jr.

Upon the other possessions above mentioned claimed
by defendants, a great mass of proof has been taken by
both sides. We have carefully examined this testimony,
and we are of opinion that, under the great weight of
the evidence, these possessions have not been made out.
It would unduly lengthen this opinion, and would serve
no useful purpose, to review the testimony of the large
number of witnesses introduced, a great deal of which is
very conflicting. In his written opinion filed in the re-
cord, the chancellor has set out a somewhat detailed

Inman v. Tucker.

summary of the evidence upon these possessions, together with his conclusions thereon, with which we substantially agree.

It results from the foregoing that there is no error in the decree of the chancellor, and it is accordingly affirmed.