# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
April 1, 2016 Session

## PEGGY L. SMITH, INDIVIDUALLY AND AS TRUSTEE OF PEGGY L. SMITH TRUST v. HI-SPEED, INC., ET AL.

### Appeal from the Chancery Court for Shelby County
### No. CH1115571      Walter L. Evans, Chancellor

_____

### No. W2015-01613-COA-R3-CV – Filed August 30, 2016

_____

This is a breach of contract case related to a commercial property located in Arkansas. Plaintiffs also asserted claims for unjust enrichment, quantum meruit, equitable estoppel, and promissory estoppel. Following a hearing on Defendants' motion for partial summary judgment, the trial court dismissed all of the claims except for an alleged breach of contract by Defendant Hi-Speed, Inc. After a bench trial on this remaining claim, the trial court determined that the Plaintiffs were not entitled to any damages. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Carl I. Jacobson, John J. Cook, and Jonathan P. Lakey, Memphis, Tennessee, for the appellant, Peggy L. Smith.

John J. Heflin and Jack F. Heflin, Memphis, Tennessee, for the appellees, Hi-Speed, Inc., and Mock, Inc.

# OPINION

## Background and Procedural History

This appeal stems from a dispute regarding the financing and leasing of an Arkansas commercial building located on Lindsey Road in the Little Rock Port Industrial Park (the "Little Rock Property"). The Little Rock Property is owned by the Peggy L. Smith Trust (the "Trust"). The trustee of the Trust, as well as its sole beneficiary, is Peggy L. Smith ("Ms. Smith"). At a time prior to the commencement of this lawsuit, the Trust also owned real property at 3013 Thomas Street in Memphis, Tennessee (the "Thomas Street Property").

The Defendants in this case, Hi-Speed, Inc. ("Hi-Speed"), and Mock, Inc. ("Mock") (collectively, "Defendants"), are both engaged in the same general line of business. Both companies sell, maintain, test, and repair electrical motors, hoists, and cranes. Although Hi-Speed and Mock have had common leadership and ownership at various points throughout their history, Hi-Speed is incorporated in Arkansas, whereas Mock is incorporated in Tennessee. Mock, which was incorporated in 1978, previously operated its business at the Thomas Street Property.

The present dispute can be traced to developments involving both Defendants over the past decade. Although Ms. Smith previously had ownership interests in both corporations, her ownership interests had ceased by the time of these recent developments. By 2005, both Hi-Speed and Mock were seeking to expand. Ms. Smith's son, Bret Mock, served as President of both companies. Although Mock was operating out of the Thomas Street Property at the time, it relocated to a facility in Millington, Tennessee, before the end of 2006. Prior to its move to the Millington facility, Mock had been paying rent to Ms. Smith[1] for a lease of the Thomas Street Property. The base rent amount was $4,000.00 per month.

Hi-Speed also made plans to move into a new facility during this period. On December 1, 2005, Hi-Speed entered into a lease agreement with the Trust regarding the Little Rock Property. In pertinent part, the lease agreement provides as follows:

> **WHEREAS**, [the Trust] is the owner of certain real property and is willing to "build to suit" a facility as hereinafter described in EXHIBIT "B"; and

---

[1] The Trust was not in existence at the time Mock began paying Ms. Smith rent for its lease of the Thomas Street Property.

**WHEREAS**, [Hi-Speed] desires to lease the real property, facility and improvements from [the Trust].

**NOW, THEREFORE**, in consideration of the mutual covenants, conditions and promises set forth herein, [the Trust] and [Hi-Speed] agree as follows:

1. Premises. [The Trust] hereby agrees to build the facility described in EXHIBIT "B" on the real property on Lindsey Road in Little Rock, Arkansas, which is further described in EXHIBIT "A" ("Premises") and further agrees to lease same to [Hi-Speed] upon completion of construction within the period specified in EXHIBIT "B".

2. Term. The initial term (the "Initial Term") of this Lease shall be for twenty (20) years commencing upon issuance of a valid Certificate of Occupancy for the operation of [Hi-Speed's] business at the Premises (the "Commencement Date"). [Hi-Speed] shall have the right, but not the obligation, to renew this Lease for two (2) additional five (5) year terms ("Renewal Terms") by written notice to [the Trust] on or before thirty (30) days prior to the expiration of the Initial Term or either Renewal Term, as applicable. During the Renewal Terms, this Lease shall continue on the same terms, covenants and conditions as in the Initial Term.

3. Rental.

(a) Base Rent. Beginning on the Commencement Date and on the first day of each calendar month thereafter, [Hi-Speed] shall pay to [the Trust] without notice or demand from [the Trust] and without right of set-off the sum of Fourteen Thousand and No/100 Dollars ($14,000.00) as rental for the Premises ("Base Rent"). In the event [the Trust] fails to pay sums that [the Trust] is obligated to pay under this Lease, [Hi-Speed] may pay such sums on behalf of [the Trust] and deduct same from Base Rent.

(b) Additional Rent. In addition to Base Rent, [Hi-Speed] shall be responsible for the following additional costs, without first receiving demand therefor (except as otherwise expressly provided below) and without offset against the Base Rent:

(i) [Hi-Speed] shall reimburse [the Trust] for interest expense, loan fees and related costs of the construction financing during the construction phase of the Premises until the Commencement Date.

(ii) **In consideration for the pledging by [the Trust] of its real property in Memphis, Tennessee, known municipally as 3013 Thomas Street to further secure the construction financing, [Hi-Speed] shall pay [the Trust] Four Thousand and No/100 Dollars per month for so long as said property shall serve as said additional collateral**.

\* \* \* \*

20. Miscellaneous

(a) Successors and Assigns.    This Lease shall be binding upon and shall inure to the benefit of [The Trust], [Hi-Speed] and their respective successors and assigns.

(b) Governing Law.    This Lease shall be construed under the laws of the State of Tennessee.

(c) Entire Agreement.    This Lease contains the entire agreement between [the Trust] and [Hi-Speed] regarding the Premises which are the subject of this Lease and may only be altered by a written agreement executed by both [the Trust] and [Hi-Speed].  (emphasis added)

According to Ms. Smith, the above written agreement does not represent the entirety of the parties' agreement regarding the Little Rock Property.  Contrary to the terms of the lease agreement, she contends that the $4,000.00 payment of "Additional Rent" was not tied solely to the timeframe that the Thomas Street property served as collateral to secure construction financing.  She asserts that a "Loan Guaranty Agreement" entered into between her and the Defendants provided a different understanding.  As outlined in the Complaint that Ms. Smith filed in connection with this litigation, the purported "Loan Guaranty Agreement," which was not in writing, covered the following terms:

(a) Smith would sell the Thomas Street Building and invest the proceeds into the construction of the Little Rock Facility.  Defendants would assist Smith in her efforts to sell the Thomas Street Building.

(b) Smith would borrow another $1 million or more to complete the construction of the Little Rock Facility.

(c) Hi-Speed, Inc. would enter into a lease for a 20 year term.

(d) The rent under the lease would be an amount approximately equal to the monthly principal and interest payments due under the loan for the construction of the Little Rock Facility.

(e) As consideration for her agreement to sell and commit the proceeds of the Thomas Street Building to the project, and for the risk incurred by Smith in financing the Little Rock Facility, Defendants agreed to pay Smith a monthly amount . . . for the term of the loan equal to $4,000.00, plus an additional amount to be determined at later date.

Although her Complaint specifically states that Defendants were to pay the additional "monthly amount" for the term of the *loan*, Ms. Smith has averred generally in this litigation that the additional payments were to be made for a period of twenty years.[2] Moreover, she has argued that the additional monthly payments were to, in part, replace the rent she previously received from Mock's lease of the Thomas Street Property.

To secure financing for the construction of the improvements to the Little Rock Property where Hi-Speed eventually relocated, the Trust pledged the Thomas Street Property to Eagle Bank and Trust Co. ("Eagle Bank"). After the construction loan matured, Ms. Smith obtained permanent financing, which required her to make monthly payments to Eagle Bank in the amount of $13,050.75. In February 2008, Hi-Speed began paying this monthly amount directly to Eagle Bank as an accommodation to Ms. Smith and the Trust. Prior to this time, Hi-Speed had paid $12,500.00 per month directly to Eagle Bank, an amount equal to the payments required under the construction loan.

Hi-Speed also made additional $4,000.00 monthly payments to Ms. Smith while the Thomas Street Property was pledged as collateral[3] in accordance with the written lease agreement, and it continued to make these payments even after the Trust sold the Thomas

---

[2] Although the loan discussed in the Complaint was contemplated to be a loan for a term of twenty years, the payment of the additional monthly amounts is not directly tied to the term of a loan, at least as the agreement is presently represented. Ms. Smith simply avers that the Defendants agreed to lease the Little Rock Property "and for a period of 20 years: to pay [Plaintiffs] . . . $4,000 to $5,500 per month."

[3] Hi-Speed presently maintains, consistent with the written lease agreement, that the additional $4,000.00 monthly payments were only required to be made so long as the Thomas Street Property served as collateral.

Street Property at auction in February 2008. According to the deposition testimony of Barbara McCullough ("Ms. McCullough"), former Secretary/Treasurer for Hi-Speed, Bret Mock directed that these payments be made over her objection. In late 2008, Hi-Speed increased its additional payments from $4,000.00 to $5,500.00 per month.

In January 2009, Bret Mock passed away. Notwithstanding Bret's death, the $5,500.00 monthly payments continued to be made by Hi-Speed to Ms. Smith. According to Ms. McCullough's deposition testimony, Hi-Speed continued to make the payments at the direction of Bret's surviving wife, Ellen Mock. Ms. McCullough also stated in her deposition that the payments continued to be made after consultation with counsel. Kevin Maxwell, President of both Hi-Speed and Mock following Bret Mock's death, testified similarly in his deposition.

In January 2011, attorney Patrick Mason, acting as counsel for Ms. Smith, sent a letter to Mr. Maxwell and enclosed a proposed amendment to the written lease agreement. The letter stated that the enclosed lease amendment "reflect[ed] the increased rent previously agreed upon by Hi-Speed, Inc. and Peggy Smith." The letter further stated that an additional year had been added to the term of the lease "in order to fulfill the contractual requirement of consideration by both parties." Hi-Speed never executed this amendment, and in May 2011, the company was purchased by two new owners. On May 20, 2011, following this transition in ownership, one of Hi-Speed's new owners sent an email to Ms. McCullough directing her to stop making the additional $5,500.00 monthly payments to Ms. Smith. Hi-Speed subsequently ceased making these payments.

As a result of Hi-Speed's decision to stop making the additional monthly payments, Ms. Smith filed a complaint for damages in the Shelby County Chancery Court on September 23, 2011. The Complaint was brought in Ms. Smith's capacity as trustee of the Trust, as well as in her individual capacity. In addition to alleging that Hi-Speed had breached the written lease agreement, Ms. Smith averred that the Defendants had not made all payments required pursuant to the purported "Loan Guaranty Agreement." According to the Complaint, the written lease agreement entered into between Hi-Speed and the Trust only partially reflected the "Loan Guaranty Agreement" allegedly agreed to by both Defendants. As previously indicated, under the alleged "Loan Guaranty Agreement," for which there was no executed written agreement, the additional monthly payments were required to be made even after the Thomas Street Property ceased serving as collateral. Ms. Smith contended that Mock and Hi-Speed had breached their agreement by failing to continue to make the additional monthly payments. She also asserted claims of unjust enrichment, quantum meruit, equitable estoppel, and promissory estoppel. Both Defendants filed answers to the Complaint in July 2012.

Approximately a year and a half later, on March 12, 2014, Mock and Hi-Speed filed a joint motion for partial summary judgment as to five of the six counts asserted in the Complaint. The only count of the Complaint that was not subject to the motion was Ms. Smith's claim that Hi-Speed had breached the written lease agreement. Filed contemporaneously with the motion was a statement of undisputed material facts and a legal memorandum. Among other things, the Defendants argued that the alleged "Loan Guaranty Agreement" was not supported by a writing compliant with the Statute of Frauds.

On October 15, 2014, Ms. Smith filed a response to the Defendants' statement of material facts, as well as a separate statement of undisputed material facts. Additionally, Ms. Smith filed a memorandum in opposition to the Defendants' summary judgment motion. Therein, Ms. Smith contended that genuine issues of material fact existed as to whether the additional monthly payments were to continue after the sale of the Thomas Street Property. She also claimed that genuine issues of material fact existed as to the asserted unjust enrichment, quantum meruit, promissory estoppel, and equitable estoppel claims. Citing to several pieces of evidence, Ms. Smith argued that the parties intended the additional monthly payments to continue for a period of twenty years. She further argued that the parties' agreement regarding these payments complied with the Statute of Frauds. On February 9, 2015, Defendants filed a reply memorandum in support of their summary judgment motion, in addition to a response to Ms. Smith's separate statement of undisputed material facts. The trial court held a summary judgment hearing a few days later.

On February 23, 2015, the trial court entered an order granting the Defendants' motion for partial summary judgment. Although the trial court acknowledged that Ms. Smith asserted the existence of an agreement that differed slightly from the written lease agreement, it concluded that the cited testimony supporting the purported separate agreement was barred by the doctrine of merger and the parol evidence rule. The trial court further determined that Ms. Smith's assertion of the separate agreement was barred by the Statute of Frauds. With regard to the unjust enrichment and quantum meruit counts, the court concluded that these claims were unavailable given the existence of an enforceable contract regarding the Little Rock Property. With regard to the asserted promissory estoppel and equitable estoppel claims, the trial court concluded that Ms. Smith had failed to proffer any evidence justifying the application of these theories.

Following the entry of the trial court's February 23 order, only one of Ms. Smith's claims remained: the breach of contract claim regarding the written lease agreement entered into between the Trust and Defendant Hi-Speed. Although a trial on this claim was originally set for July 9, 2015, the case was later reset to July 16, 2015. Following a full evidentiary hearing, the trial court entered its final judgment in the case on July 22, 2015. The trial court concluded that no basis for a claim existed against Mock because Mock was

not a party to the written lease agreement. Moreover, upon determining that Hi-Speed had paid the Trust more than it was obligated to under the parties' contract, the trial court concluded that no monetary relief was available to Ms. Smith. This timely appeal followed.

## Issues Presented

In the appellate brief filed by the Trust and Ms. Smith, three issues are presented for our review, slightly restated as follows:

1. Whether the trial court appropriately applied the parol evidence rule and the Statute of Frauds in granting summary judgment to Defendants on Plaintiffs' breach of contract claim concerning the Loan Guaranty Agreement.

2. Whether the trial court erred in granting summary judgment to Defendants on Plaintiffs' unjust enrichment, quantum meruit, promissory estoppel, and equitable estoppel claims.

3. Whether the trial court erred in granting a judgment to Defendants on Plaintiffs' breach of contract claim for failure to pay the full base rent.

## Standard of Review

"In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise." *Foster-Henderson v. Memphis Health Ctr., Inc.*, 479 S.W.3d 214, 223 (Tenn. Ct. App. 2015) (citing Tenn. R. App. P. 13(d)). Although we also review the trial court's resolution on a question of law de novo, no presumption of correctness attaches to the trial court's legal conclusions. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

"Because the review of a trial court's grant of summary judgment is a question of law, the standard of review is de novo, according no presumption of correctness to the trial court's determination." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008) (citations omitted). Accordingly, when we review whether a grant of summary judgment was proper, this Court must make a fresh determination that the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013). A motion for summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

The party moving for summary judgment has the ultimate burden of persuading the court that no genuine issues of material fact exist and that it is entitled to a judgment as a matter of law. *Town of Crossville Hous. Auth. v. Murphy*, 465 S.W.3d 574, 578 (Tenn. Ct. App. 2014) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). If the moving party makes a properly supported motion, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact for trial. *Id.* (citing *Byrd*, 847 S.W.2d at 215). When the party moving for summary judgment does not bear the burden of proof at trial, the moving party may satisfy its burden of production by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015); *see also* Tenn. Code Ann. § 20-16-101.[4] If the moving party satisfies its initial burden of production, the nonmoving party cannot rest upon the mere allegations or denials in its pleadings, but must respond and set forth specific facts at the summary judgment stage showing that there is a genuine issue for trial. *Rye*, 477 S.W.3d at 265 (quoting Tenn. R. Civ. P. 56.06). "The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id.*

## Discussion

This appeal requires us to consider whether the claims asserted by Ms. Smith and the Trust (collectively, "Plaintiffs") were properly dismissed by the trial court. Five of the six claims pled in the Complaint were dismissed by summary judgment. The remaining count, which related to an alleged breach of the written lease agreement, was dismissed following a trial. In reviewing the propriety of the trial court's actions, we turn first to the trial court's February 23, 2015 summary judgment order.

### *The trial court's grant of partial summary judgment*

The trial court's February 23, 2015 summary judgment order dismissed every claim asserted in the Complaint, save for the Trust's claim that Hi-Speed breached the written lease agreement that was executed in December 2005. On appeal, Ms. Smith and the Trust

---

[4] Although the standard outlined in Tennessee Code Annotated section 20-16-101 appears to be substantially similar to the *Rye* standard, "there is still some disagreement amongst members of this Court as to whether the standard set out in *Rye* or in Tennessee Code Annotated Section 20-16-101 is controlling." *Dennis v. Donelson Corp. Ctr. 1*, No. M2015-01878-COA-R3-CV, 2016 WL 2931096, at *2 n.1 (Tenn. Ct. App. May 13, 2016).

challenge the trial court's adjudication of each claim dismissed at summary judgment. We examine each claim in turn.

### Count 1- Alleged Breach of the "Loan Guaranty Agreement"

The central point of contention in this case relates to the required duration of the additional monthly payments concerning the Little Rock Property. Under the written lease agreement executed in December 2005, the $4,000.00 monthly payments were due "so long as [the Thomas Street Property] shall serve as . . . collateral." Although the terms of this provision are unambiguously clear as to their meaning, Ms. Smith argues that they fail to fully reflect the "Loan Guaranty Agreement" purportedly entered into between her and both Defendants. In contrast to the plain language of the written agreement, she contends that the additional monthly payments were to be made for a period of twenty years, irrespective of the status of the Thomas Street Property.

As already noted, the trial court dismissed Ms. Smith's claim for breach of the "Loan Guaranty Agreement" on several grounds. In addition to concluding that the evidence marshaled in support of the "Loan Guaranty Agreement" was inadmissible under the doctrine of merger and the parol evidence rule, the trial court determined that the contract claim was barred by the Statute of Frauds. On appeal, Plaintiffs argue that the reasoning employed by the trial court was in error. In addition to challenging the trial court's application of the parol evidence rule, Plaintiffs assert that the trial court erred in holding that the alleged "Loan Guaranty Agreement" was barred by the Statute of Frauds.

Before turning to the specifics of Plaintiffs' arguments on these issues, it is worthwhile to clarify the parameters of the agreement that Ms. Smith and the Trust are seeking to enforce. Having carefully reviewed the record, we note that the Plaintiffs' represented terms of the agreement have changed throughout the course of this litigation. This is most apparent as to the stated amount of the additional monthly payments, although there are some subtle distinctions as to the representation of the duration term as well. In order to explain the current position of the Plaintiffs, we will endeavor to briefly provide an overview of the manner in which the "Loan Guaranty Agreement" has been presented throughout the course of this case.

As alleged in the Complaint, the "Loan Guaranty Agreement" provides that the Defendants would pay Ms. Smith "a monthly amount . . . for the term of the loan equal to $4,000.00, plus an (additional amount) to be determined at later date." As is evident from the ordinary words of the agreement, the payment of the stated monthly amount is directly tied to

the term of a loan.[5]  Moreover, the agreement provides that an additional amount will be determined in the future.  No upper limit for the "additional amount" is specifically provided for in the version of the agreement alleged in the Complaint, nor is there any method discussed by which the additional amount will be determined.

In her July 16, 2012 deposition, Ms. Smith testified similarly regarding the promised amount of the additional monthly payments.  She stated that Bret Mock had promised her that she would not suffer a lapse in payments from the $4,000.00 in rent that Mock had been paying for its lease of the Thomas Street Property.  Her recollection of her first conversation with Bret on the topic was as follows:

> I would receive no less than the 4,000 a month.  And that as time and opportunity allowed that it would increase due to my added risk and committing my property and building to this venture.  And in the beginning there was not a set date as to when this would happen because there was so many things going on with the renovations and the building and all of that.  And then when he had the opportunity, he told me he was going to increase it.

With respect to the duration of these payments, Ms. Smith expressed difficulty in recalling the specific words Bret used in making his promise.  At one point, she stated as follows in her deposition:  "[T]he understanding that we had [was] that I would receive [the additional monthly payments] until the building was paid for."  Immediately thereafter, Ms. Smith attempted to clarify her response with another understanding: "Well, or until the end of the lease or until the end of, yeah, to the end of the lease or those were inferred in different ways."

In her May 2014 affidavit, Ms. Smith recalled her alleged agreement with the Defendants as follows:

> In or around November 2005, I was approached by Hi-Speed and asked to personally borrow $1.6 million dollars for a construction loan to fund Hi-Speed's expansion plans and was asked to sell the Thomas Street property and use the sale proceeds to apply to the construction of the facility.  In exchange, Mock, Inc. and Hi-Speed, Inc. agreed to lease the facility and for a period of 20 years: to pay me and the Smith Trust a[] monthly amount sufficient to cover all of the required loan payments, plus $4,000 to $5,500 per month to replace

---

[5] The total duration of the additional payments is no different under this version of the alleged agreement than it is in the other representations made by Plaintiffs: the loan referenced in the Complaint was contemplated to be for a term of twenty years.  Other representations of the agreement, however, do not specifically tie the timing of the payments to the term of a loan.

the rent previously received on the Thomas Street Building and to compensate for the risk on the loan.

This specific recitation of the agreement is the one Plaintiffs referenced in opposing the Defendants' motion for summary judgment; moreover, it is the one that they have relied upon in prosecuting this appeal. As is clear, the term for the additional monthly payments is "for a period of 20 years." In contrast to the Complaint and Ms. Smith's deposition testimony, which both call for a baseline additional monthly payment of $4,000.00 plus an extra amount to be determined in the future, Ms. Smith's affidavit represents that the agreed amount term was within a specific range, "$4,000 to $5,500 per month."

### Parol Evidence Rule

Among other reasons, the trial court dismissed Plaintiffs' claim for breach of the "Loan Guaranty Agreement" by finding that Ms. Smith's testimony concerning the agreement was barred by the parol evidence rule. "The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts." *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990) (citation omitted). In furtherance of this purpose, the rule provides that "contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *Id.* (citations omitted). Although the parole evidence rule appears to have a wide reach, the courts of this State have been reluctant to apply it mechanically and have recognized that it has several exceptions and limitations. *Id.* The rule does not prevent parties from using extraneous evidence to prove the existence of an independent or collateral agreement not in conflict with the written agreement, *id.*, nor does it prevent parties from using extraneous evidence to demonstrate supplemental, consistent terms where the writing is not intended to be a complete and exclusive statement of the agreement. *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 838 (Tenn. Ct. App. 1980) (citation omitted). Moreover, courts have held that the rule does not prevent parties from using extraneous evidence "to prove that a written contract does not correctly embody the parties' agreement." *GRW Enters., Inc.*, 797 S.W.2d at 611 (citations omitted). Additionally, the rule does not bar parties from proving the existence of an agreement made after an earlier written agreement. *Id.* at 610 (citations omitted).

Plaintiffs argue that each of the above-mentioned exceptions can apply so as to allow them to prove the existence of the "Loan Guaranty Agreement" outside the bar of the parol evidence rule. Indeed, in their brief on appeal, they alternatively argue that tendering proof of the "Loan Guaranty Agreement" is permissible because (a) the proof would demonstrate the existence of an independent collateral agreement, (b) the proof would provide additional terms that supplement the written agreement, (c) the proof would show that the written

agreement does not correctly embody the parties' true agreement, and (d) the proof would demonstrate a permissible modification to the written agreement. Having reflected on each of Plaintiffs' arguments as to why the parol evidence rule should not bar proof of their claim for breach of the alleged "Loan Guaranty Agreement," we conclude that the first three can be dispensed with rather quickly.

Although there is no question that parol evidence is admissible to demonstrate the existence of an independent collateral agreement, proof of such a collateral agreement "must be limited to subject matter which does not *contradict* or *vary terms* which are plainly expressed in the writing." *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990) (citations omitted). In this case, the alleged terms of the "Loan Guaranty Agreement" clearly contradict what is provided for in the written agreement. As noted by Defendants, the proposed terms of the parol agreement contradict both the amount and duration of the additional monthly payments. Whereas the additional payments were set at $4,000.00 under the written lease agreement and were to last as long as the Thomas Street Property was pledged as collateral, the alleged "Loan Guaranty Agreement" calls for the payments to last for twenty years and in the range of $4,000.00 to $5,500.00 per month. We note that the Plaintiffs' Complaint directly states that the $4,000.00 payment owed under the written lease agreement is the same additional monthly payment that is owed under the alleged "Loan Guaranty Agreement." The specific terms on which this payment is made, however, clearly differ depending on whether the written agreement or "Loan Guaranty Agreement" is controlling. As such, Plaintiffs' reliance on a supposed independent collateral agreement is untenable.

Similarly, we must reject Plaintiffs' assertion that proof of the "Loan Guaranty Agreement" provides evidence of additional terms that supplement the written agreement. The terms of the "Loan Guaranty Agreement" are not consistent with and supplementary to the written agreement; instead, they contradict the terms of the written lease. Accordingly, we reject Plaintiffs' contention that the evidence of the "Loan Guaranty Agreement" provides admissible evidence of supplemental terms. *See Gibson Cnty. v. Fourth and First Nat'l Bank*, 96 S.W.2d 184, 189 (Tenn. Ct. App. 1936) (noting that parol evidence may be heard to supply parts omitted from a writing but that the added matter cannot contradict the written contract).

We also reject Plaintiffs' argument that parol evidence is admissible in this matter to demonstrate that the written agreement does not correctly embody the parties' true agreement. Although case law does allow for the admissibility of evidence for this purpose as a general matter, this exception to the parol evidence rule is applicable in lawsuits that seek to reform a written agreement. *See, e.g.*, *Rentenbach Eng'g Co. v. Gen. Realty Ltd.*, 707 S.W.2d 524, 526-27 (Tenn. Ct. App. 1985) (noting that the parol evidence rule does not bar

proof of testimony extraneous to the written contract when offered in a lawsuit to reform the contract on the ground of mutual mistake). As Defendants have pointed out in their brief on appeal, Plaintiffs never prayed to reform the written lease in this case.

Although the above arguments do not present a proper basis for overturning the trial court's reliance on the parol evidence rule in this case, this does not necessarily mean that the parol evidence rule should act as an absolute bar to Plaintiffs' assertion of the "Loan Guaranty Agreement." In articulating a fourth exception for evading the bar of the parol evidence rule, Plaintiffs generally assert that there is evidence in the record from which it could be concluded that the parties *modified* the written lease agreement. Assuming that there is evidence creating a genuine issue of fact on this matter, the trial court's dismissal of the "Loan Guaranty Agreement" claim due to the parol evidence rule would be in error. As we have previously noted, the parol evidence rule "does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement." *GRW Enters., Inc.*, 797 S.W.2d at 610 (citations omitted); *see also Brunson v. Gladish*, 125 S.W.2d 144, 147 (Tenn. 1939) ("[I]t is well settled that [the law] does not prohibit the establishment by parol evidence of an agreement made subsequent to the execution of the writing, although such subsequent agreement may have the effect of adding to, changing, modifying or even altogether abrogating the contract of the parties as evidenced by the writing[.]").

Defendants argue that this exception to the parol evidence rule is inapplicable by claiming that Plaintiffs have always asserted the existence of an agreement made *prior* to the written lease, not a subsequent one. In support of their position on this issue, Defendants rely primarily on paragraph eleven from Ms. Smith's affidavit. In full, that paragraph states as follows:

> 11. In or around November 2005, I was approached by Hi-Speed and asked to personally borrow $1.6 million dollars for a construction loan to fund Hi-Speed's expansion plans and was asked to sell the Thomas Street property and use the sale proceeds to apply to the construction of the facility. In exchange, Mock, Inc. and Hi-Speed, Inc. agreed to lease the facility and for a period of 20 years: to pay me and the Smith Trust a[] monthly amount sufficient to cover all of the required loan payments, plus $4,000 to $5,500 per month to replace the rent previously received on the Thomas Street Building and to compensate for the risk on the loan.

There is no question that the Plaintiffs have alleged facts suggesting that certain conversations occurred prior to the execution of the written lease agreement. Indeed, inasmuch as the Plaintiffs have argued that the written lease does not fully embody the

parties' true agreement, they have consistently pointed towards the existence of some prior agreement. We would not dispute that evidence of such a prior agreement would be barred by the parol evidence rule,[6] nor would we dispute that paragraph eleven of Ms. Smith's affidavit is perhaps suggestive of the fact that an agreement different from the written lease was reached prior to the written lease's execution. We note, however, that nothing in that paragraph specifically states when the parties reached an agreement.[7] Even if we construed the affidavit as indicating that an agreement had been reached in November 2005, that does not mean that evidence of agreements made subsequent to the written lease would be inadmissible. In this regard, although Defendants' reliance on Ms. Smith's affidavit is understandable, we note that nowhere does the affidavit specifically limit the parties' agreement(s) to a time before the written lease agreement was executed. Moreover, there is evidence in the record that suggests that conversations regarding the "Loan Guaranty Agreement" took place both before and after the written lease agreement had been signed. In fact, when asked about this issue in her deposition, Ms. Smith stated that the conversations about the "Loan Guaranty Agreement" were "pretty continual." She testified that she was sure that some of the conversations "were made before, some were made during[,] and some [were] made after." Viewing the evidence in the light most favorable to the Plaintiffs, who were the nonmoving parties on summary judgment, we are compelled to conclude that a genuine issue of fact exists as to whether any of the Defendants' alleged promises to Ms. Smith were made after the written lease agreement. Because conduct occurring after the execution of the written lease agreement could serve as a basis for modifying the written contract, the parol evidence rule should not prevent Plaintiffs from establishing the existence of the "Loan Guaranty Agreement."

**Statute of Frauds**

Although there is evidence in the record that could be offered to prove the "Loan Guaranty Agreement" without violating the parol evidence rule, this does not necessarily mean that summary judgment was improper. When Defendants moved for summary judgment, they specifically argued that the claimed agreement did not comply with the

---

[6] Further, we would not question that proof of the "Loan Guaranty Agreement" would be barred by the doctrine of merger if that claim was based solely on agreements made prior to the written agreement. The doctrine of merger is similar to the parol evidence rule. "The principle of merger . . . states that prior or contemporaneous negotiations and agreements are integrated into a contract intended by the parties to be a complete expression of their agreement." *GRW Enters., Inc.*, 797 S.W.2d at 610 n.2. On appeal, Plaintiffs have not specifically challenged the trial court's determination that the alleged "Loan Guaranty Agreement" is barred by the doctrine of merger.

[7] Although the paragraph mentions the date November 2005, that time period is referenced to indicate when Ms. Smith was approached by Hi-Speed regarding potential arrangements for Hi-Speed's expansion plans. The paragraph does not specifically state whether the parties' agreement occurred during the same period.

Statute of Frauds. This is significant inasmuch as "[t]he parol evidence rule and the statute of frauds are separate rules that operate independently from each other." *GRW Enters., Inc.*, 797 S.W.2d at 611 (citations omitted). As this Court previously explained:

> The statute of frauds does not exclude parol evidence; it simply makes certain agreements unenforceable through suit unless they are evidenced by a signed memorandum. The parol evidence rule protects a completely integrated written contract from being varied or contradicted by extraneous evidence but does not require any particular type of agreement to be in writing.
>
> * * * *
>
> Thus, evidence that does not run afoul of the parol evidence rule may be ineffective under the statute of frauds, and vice versa.

*Id.* at 612.

As taken from Ms. Smith's affidavit, the alleged "Loan Guaranty Agreement" covered the following terms: In exchange for Ms. Smith's efforts in financing the construction of a new facility, which were to include selling the Thomas Street Property and applying its proceeds to construction, Mock and Hi-Speed agreed to lease the new facility, and "for a period of 20 years . . . pay [Plaintiffs] a[] monthly amount sufficient to cover all of the required loan payments, plus $4,000 to $5,500 per month to replace the rent previously received on the Thomas Street Building and to compensate for the risk on the loan." Like the written contract that was executed on December 1, 2005, this purported modification to the written lease agreement is subject to the Statute of Frauds as codified at Tennessee Code Annotated section 29-2-101. In pertinent part, that statute provides that:

> No action shall be brought . . . [u]pon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Tenn. Code Ann. § 29-2-101(a)(4) (2012). Because the purported modification to the written lease agreement is subject to the statute, it must be evidenced by a signed writing in order to be enforceable.

"The primary purpose of the Statute of Frauds is to reduce the risk of fraud and perjury associated with oral testimony." *Waddle v. Elrod*, 367 S.W.3d 217, 223 (Tenn. 2012) (citations omitted). By requiring certain transactions to be in writing, the statute also helps to "prevent the proof of verbal agreements after the memory of witnesses has been dimmed by lapse of time." *Boutwell v. Lewis Bros. Lumber Co.*, 182 S.W.2d 1, 3 (Tenn. Ct. App. 1944). Although a written *contract* is not necessary to satisfy the Statute of Frauds, a written memorandum or note evidencing the parties' agreement is required. *Waddle*, 367 S.W.3d at 226 (citation omitted). Moreover, "while the writing required by the Statute of Frauds must contain the essential terms of the contract, it need not be in a single document." *Id.* (citation omitted). As our State Supreme Court has explained:

> "The general rule is that the memorandum, in order to satisfy the statute, must contain the essential terms of the contract, expressed with such certainty that they may be understood from the memorandum itself or some other writing to which it refers or with which it is connected, without resorting to parol evidence. A memorandum disclosing merely that a contract had been made, without showing what the contract is, is not sufficient to satisfy the requirement of the Statue of Frauds that there be a memorandum in writing of the contract."

*Lambert v. Home Fed. Sav. & Loan Ass'n*, 481 S.W.2d 770, 773 (Tenn. 1972) (quoting 49 Am. Jur. *Statute of Frauds* §§ 353, 363-64).

Throughout this case, the parties have vigorously disputed whether a sufficient writing evidencing the alleged agreement exists. Although Plaintiffs have pointed to a number of documents that they contend satisfy the Statute of Frauds collectively, Defendants have consistently maintained that a sufficient memorandum or note is lacking. Moreover, Defendants have argued that the documents relied upon by Plaintiffs are not properly authenticated and, therefore, not admissible.

On appeal, Plaintiffs insist that the Defendants' concern regarding authentication was not timely raised in the trial court, and they note that the trial court did not address the merits of the authentication issue when adjudicating Defendants' motion for summary judgment. The rationale behind the trial court's decision to not rule on the authentication issue is provided in a footnote that begins on page four of its February 23, 2015 summary judgment order. Therein, the trial court concluded that it did not need to reach the issue of authentication "because no document or related documents, whether authenticated or unauthenticated, and whether signed by Defendant(s) or by both parties . . . , contain the essential terms of the agreement claimed by Plaintiff, without resort to parol." Like the trial court, we find it unnecessary to evaluate whether Defendants' authentication concerns have

any substantive merit.  We agree that the documents relied on by Plaintiffs do not contain the essential terms of the alleged agreement.  The documents on which Plaintiffs rely consist of (a) three separate emails purportedly sent by Bret Mock between 2005 and 2008, (b) a general ledger of certain payments made by Hi-Speed to Ms. Smith and Eagle Bank from 2006 to 2011, and (c) corporate tax returns of Hi-Speed from 2007 through 2010.  Whereas the last two of these items generally demonstrate certain "rent" payments that Hi-Speed made in the years immediately following the written lease's execution, the emails relied on by Plaintiffs contain a number of assertions regarding a lease of a Little Rock facility.  Although these documents ostensibly broach the same subject matter as the written lease agreement, they do not clearly evidence the terms of the alleged agreement that Plaintiffs assert is controlling in this cause.  In order to glean the meaning from the documents that Plaintiffs suggest is available therein, we would need to resort to parol evidence.  Indeed, even when read together, the documents fail to evidence the alleged agreement that Plaintiffs set forth in count 1 of their Complaint.

The first email cited by Plaintiffs is dated December 5, 2005.  It reads as follows:

LeeAnne[8],
Please review this lease for both parties.  Peggy Smith is my mother.
She is going to sell (I am going to sell for her) her 3013 Thomas St. property where we currently rent for $4000 and use it along with another borrowed $1,000,000 to build a new facility on a lot she owns in the Little Rock River Port Industrial Park.  The intent is to maintain her income stream and cover her expenses for the loan plus some guarantors fee for a 20 year loan at Eagle Bank in L.R.  (Butch Lomax with Eagle is the one I referred to you about title work).  This is essentially a duplication of her current lease for the Memphis property.
Any questions, please advise.
Thanks,
Bret

Although this email purportedly contains a lease as an attachment, the specific attachment has not been provided.  As such, we do not know the terms of the attached lease.  Obviously, if the attached lease referenced in the email was the prior written contract from December 1, 2005, the terms contained therein would contradict the terms of the "Loan Guaranty Agreement" Plaintiffs assert is controlling.  Moreover, we note that the December 5 email itself fails to evidence the payment terms that Plaintiffs suggest it does.

---

[8] Plaintiffs have identified the recipient of this email as Memphis attorney LeeAnne Cox.

The second email relied on by Plaintiffs is dated August 7, 2007, and is a response to an email purportedly sent by Matthew Shirley from Regions Bank on the same day. According to Plaintiffs, these emails were exchanged as Ms. Smith sought permanent financing for the Little Rock Property. Matthew Shirley's email to Bret Mock posed a number of questions. In pertinent part, it stated as follows: "How long has the company been in the new facility in Little Rock? It looks like the company is currently paying Peggy $17,000 per month in rent for the facility. Does this sound correct?" In response, Bret Mock stated as follows:

> Since November of 06. The $17,000 includes a previous amount for the 3013 Thomas St. property that is yet to be sold. That will probably be close to her ongoing income. . . . maybe a little more. While not necessarily sound business practice, the payment will equal her notes, tax, etc. plus about $50k income (which covers prior equity in the LR land and the Memphis property and risk).
>
> We will revise the lease when that all gets sorted out.
> Bret

Although Bret Mock's response indicates that he was making $17,000.00 payments in rent at the time of the August 7 email, the email does not contain the terms of the "Loan Guaranty Agreement." Moreover, we agree with Defendants that the terms of the email indicate that any terms of a lease revision had not been agreed upon or settled. In addition to stating that the lease would be revised in the future, the email contains several phrases embedded with conjecture and uncertainty, i.e., "That will *probably* be close to her ongoing income," "*maybe* a little more," and "*about* $50k income." (emphasis added).

The final email relied on by Plaintiffs is dated August 13, 2008. According to Plaintiffs' separate statement of undisputed material facts, this email was sent to the Defendants' appraiser, Bob King. The entirety of the August 13 email is reproduced below:

> **From:** Bret Mock
> **Sent:** Wednesday, August 13, 2008 9:22 AM
> **To:** RSKing11@aol.com
> **Subject:** Little Rock building lease . . . . . . guaranteed for 20 year minimum
> Plus Personally guaranteed 20 year lease for $1,800,000 building in Little Rock River Port . . . . . loan with Eagle bank . . . . payment . . $18,500.00

Although this email contains a reference to a twenty year lease, it does not contain the terms of the alleged "Loan Guaranty Agreement." It references a payment of $18,500.00, but it is

unclear whether this payment is in specific reference to obligations under the lease or obligations under the referenced loan. Moreover, as Defendants have pointed out in their brief on appeal, the stated payment may be nothing more than a statement of what was being paid at the time the email was sent. Specific terms of the alleged agreement are simply not present.

As we have stated previously, even when the emails are read together and alongside the other documents referenced by Plaintiffs, they fail to establish the terms of the alleged "Loan Guaranty Agreement." To conclude that the documents evidence the terms Plaintiffs base their claim upon, we would be required to rely on parol evidence. It is not even entirely clear—from the documents themselves—whether the referenced lease in the emails concerns the Little Rock Property that is the subject of the December 1, 2005 written lease agreement. Although we might assume that this is the case, the documents do not plainly establish this point, nor do they do so by reference.[9] Indeed, although the documents variously refer to "a new facility on a lot [Ms. Smith] owns in the Little Rock River Port Industrial Park," "the new facility in Little Rock," and the "building in [the] Little Rock River Port," they do not clearly establish that the property or facility being discussed is the same property governed by the December 1, 2005 written lease agreement. As such, even assuming that the other terms of the "Loan Guaranty Agreement" were somehow established by the documents relied upon by Plaintiffs, the documents would not provide sufficient evidence of an agreement related to the Little Rock Property identified in the written contract. Given our opinion on this issue, we conclude that Plaintiffs' claimed agreement fails to comply with the Statute of Frauds.

Notwithstanding the Statute of Frauds, Plaintiffs argue that their claim should not be barred due to their "part performance of the agreement." They note in their brief on appeal that "[w]hen a party begins part performance of an oral contract otherwise subject to the statute of frauds, such contract is taken out of the statute of frauds and is enforceable." Plaintiffs are correct that the Statute of Frauds is not always an absolute bar to agreements that do not comply with the statute. Based on the recognition that "the Statute itself can sometimes be turned into an instrument of the very types of evils it was designed to limit or prevent," our law does allow, in appropriate cases, for a party's performance to bring an oral contract out of the Statute of Frauds. *Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 698 (Tenn. Ct. App. 2003) (citation omitted). Case law has indicated, however, that partial performance will not create an exception to the Statute of Frauds if the subject matter of the alleged agreement involves interests in real estate. *See Campbell v. Lane*, No. 03A01-9205-CH-179, 1992 WL 335947, at *6 (Tenn. Ct. App. Nov. 18, 1992) (citation omitted) ("[A]n

---

[9] Again, we note that although the December 5, 2005 email purports to contain a lease as an attachment, the attachment was not provided by Plaintiffs. We thus have no way of discerning, from the email itself, what specific land or property was at issue in the email.

oral contract, otherwise unenforceable, can be the basis of an action if one of the parties has performed and the subject matter of the contract is personalty, but not if it is realty."); *see also Owen v. Martin*, No. M1999-02305-COA-R3-CV, 2000 WL 1817278, at *4 (Tenn. Ct. App. Dec. 13, 2000) (citations omitted) ("[I]t has long been the rule in this state that partial performance will not prevent the application of the Statute of Frauds to an agreement involving interests in real estate."). When the trial court considered Plaintiffs' partial performance argument, it rejected it on this basis, specifically concluding that "part performance does not remove application of the statute of frauds to contracts involving real estate."

On appeal, Plaintiffs maintain that the partial performance doctrine is available to escape the Statute of Frauds. They argue that the doctrine is only legally unavailable in cases involving contracts for the sale of land. Because the alleged agreement in this case pertains to a lease of land rather than a conveyance of land outright, they reason that proof of their partial performance should be admissible so as to allow them to escape the bar imposed by the Statute of Frauds. There is no question that several cases identify the partial performance doctrine as applicable to oral contracts "other than for the sale of land." *See, e.g.*, *Schnider v. Carlisle Corp.*, 65 S.W.3d 619, 622 (Tenn. Ct. App. 2001) (citations omitted). However, as previously indicated, several other decisions have stated that the doctrine will not prevent the application of the Statute of Frauds to agreements involving realty generally. *See, e.g.*, *Martin*, 2000 WL 1817278, at *4. Many of the cases that specifically link the doctrine's unavailability to cases involving parol contracts for the sale of land have regarded the inapplicability of the doctrine as a "rule of property." *See Baliles v. Cities Serv. Co.*, 578 S.W.2d 621, 624 (Tenn. 1979). Moreover, other cases have pinpointed the applicability of the partial performance doctrine as dependent on whether the subject matter of the agreement involves personal property. *See Buice v. Scruggs Equip. Co.*, 250 S.W.2d 44, 47 (Tenn. 1952) ("[W]e will enforce a verbal contract when there has been partial performance as to personal property when we will not do so as to real property."); *Trew v. Ogle*, 767 S.W.2d 662, 664 (Tenn. Ct. App. 1988) (noting that, because the subject matter of the contract constituted personal property, the partial performance exception was available to take the agreement out of the Statute of Frauds). Based on this precedent, we fail to see how an oral agreement involving a transfer of interest in land, including a leasehold interest greater than one year, can escape the bar of the Statute of Frauds based on the partial performance doctrine.

As support for their position that the partial performance doctrine can apply to a lease of real property, Plaintiffs cite two cases. The first case that Plaintiffs reference, *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003), involved a dispute over a lessor's decision to invoke termination clauses under a lease for a gas station. The plaintiffs/lessees brought suit alleging that the lessor's reliance on the termination clauses was wrongful;

among other things, the plaintiffs contended that the lease agreement had been orally modified. *Id.* at 572. Although the lessor argued that any oral modification to the parties' agreement would fail under Tennessee's Statute of Frauds, the Sixth Circuit held that the Statute of Frauds did not prevent the maintenance of the claim based on the plaintiffs' partial performance. *Id.* at 573-74. Although the implication from the *Shah* case is that parties are able to rely on partial performance as an exception to the Statute of Frauds in the context of a lease of real property, we note that we are not bound by the Sixth Circuit's opinion on matters of Tennessee law. *See Townes v. Sunbeam Oster Co., Inc.*, 50 S.W.3d 446, 452 (Tenn. Ct. App. 2001) (noting that the Sixth Circuit's interpretation and application of state law is not binding on this Court). In this vein, we further note that the *Shah* opinion does not discuss any limitation that exists under Tennessee law pertaining to the application of the partial performance doctrine with respect to interests in real property; it is not clear from the opinion whether this point was raised or considered.

The second case referenced by Plaintiffs, *Wheeler v. LaMac, Inc.*, 1986 WL 13964 (Tenn. Ct. App. Dec. 12, 1986), received little attention in Plaintiffs' brief. It was simply cited for the proposition that the partial performance doctrine can apply to a lease of real property. Having reviewed the opinion in *Wheeler*, we conclude that it fails to support the proposition that Plaintiffs claim it does. First, as Defendants have pointed out, the lease at issue in *Wheeler* was a lease of a billboard sign. *Id.* at *1. As such, it did not involve a lease of real property. *See Burks v. Elevation Outdoor Adver., LLC*, 220 S.W.3d 478, 486 (Tenn. Ct. App. 2006) ("[A] billboard constitutes a trade fixture, which retains its character as an item of personal property, and not a fixture to be considered a part of the real property on which it sits."). Second, the opinion in *Wheeler* reveals that this Court did not find partial performance to be available in that case. Although the trial court found that the plaintiff was entitled to some recovery on account of partial performance notwithstanding noncompliance with the Statute of Frauds,[10] this Court appeared to suggest that the trial court's actions could be sustained on the theory of *quantum meruit*, not partial performance. *See Wheeler*, 1986 WL 13964, at *2.

Although not specifically decided in its opinion, we think that the Supreme Court's discussion in *Irwin v. Dawson*, 273 S.W.2d 6 (Tenn. 1954), is instructive that the "rule of property" pronounced in cases such as *Baliles* and *Eslick v. Friedman*, 235 S.W.2d 808 (Tenn. 1951), is equally applicable to oral agreements to sell property in fee simple and to oral agreements for real estate leases that are to last more than one year. That is, the *Dawson* opinion appears to directly suggest what several of our decisions have repeatedly pronounced: the partial performance doctrine is unavailable to remove agreements regarding realty from the Statute of Frauds.

---

[10] The lease was for three years. *Wheeler*, 1986 WL 13964, at *2.

At issue in *Dawson* was a tenant's suit for specific performance of a lease agreement concerning real property located in Knoxville. Although the property that was the subject of the lease was owned by a husband and wife as tenants by the entirety, the written contract was only signed by the husband. *Dawson*, 273 S.W.2d at 6. The written agreement provided that a building would be built on the property "with certain rentals to be paid over a period of ten years, payable monthly, with the privilege on the part of [the tenant] to renew for an additional ten years." *Id.* at 6-7. Although the tenant subsequently went into possession of the rented property and paid the monthly rent, the wife refused to recognize the contract when her husband died several years later. *Id.* at 7. In response to the tenant's bill for specific performance, the wife demurred, pleading the Statute of Frauds as a defense. After the trial court sustained the demurrer, the tenant appealed. *Id.* Our Supreme Court ultimately affirmed the trial court's actions and stated that it was a well-settled rule that a husband could not dispose of his wife's interest in an estate owned by tenants by the entirety. *Id.* It further noted that the wife had not signed the lease in question and held that Statute of Frauds was a good defense. *Id.* at 7-8. Importantly, we note that immediately prior to its conclusion that the Statute of Frauds was a good defense against the tenant's claim for enforcement of the lease, our Supreme Court stated as follows:

> [I]t was said at page 241 of 184 Tenn., at page 336 of 198 S.W.2d:
> "The rule that the partial performance of a parol contract will not relieve from the application of the statute has become a rule of property. Goodloe v. Goodloe, 116 Tenn. 252, 92 S.W. 767, 6 L.R.A., N.S., 703, 8 Ann. Cas. 112.
>
> "In Inman v. Tucker, 138 Tenn. 512, 198 S.W. 247, it was held that where one goes into possession under a parol donation, he occupies the same relation in respect to his possession as a purchaser by parol.
>
> "In Jennings v. Bishop, 3 Shan.Cas. 138, it was held that partial performance of a parol contract for the sale of land will not take the case out of the statute, and, therefore, neither the taking of possession of land by the parol vendee and permanently improving it, nor the payment of purchase money, will prevent the vendee from electing to avoid the contract."

*Id.* at 8. As we construe it, the Supreme Court's favorable reference to this authority in the context of the facts involved in *Dawson* suggests that the "rule of property" regarding partial performance applies equally to contracts for the sale of land in fee simple and real property leases having a duration term over one year. Indeed, as we have already noted, several of our previous decisions state that partial performance will not prevent the application of the

- 23 -

Statute of Frauds "to an agreement involving interests in real estate." *See, e.g.*, *Martin*, 2000 WL 1817278, at *4. Certainly, there is no question that a lease of real property, as was implicated in the present case, governs an interest in real property. *See Mason v. City of Nashville*, 291 S.W. 1074, 1076 (Tenn. 1927) (noting that, because a lease of an upper story of a building vests in the lessee an interest in real estate, the "contracts therefor are governed by the law pertaining to real estate"); *Adler v. Double Eagle Props. Holdings, LLC*, No. W2014-01080-COA-R3-CV, 2015 WL 1543260, at *1 (Tenn. Ct. App. Apr. 2, 2015) ("This case concerns the proper interpretation of a contract governing an interest in real property. The trial court concluded that the contract unambiguously granted a lease to one party[.] . . . Affirmed[.]"), *perm. app. denied* (Tenn. Aug. 13, 2015); BLACK'S LAW DICTIONARY 1024 (10th ed. 2014) (noting that a lease includes "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration" and also refers to "[t]he piece of real property so conveyed"). Accordingly, we find no error in the trial court's determination that the partial performance doctrine was unavailable to remove the bar imposed by the Statute of Frauds.

<u>Counts 3 and 5- Unjust Enrichment and Quantum Meruit</u>

As alternative theories of recovery, Plaintiffs asserted claims for unjust enrichment and quantum meruit. These theories are "'essentially the same.'" *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 824 (Tenn. Ct. App. 2011) (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966)). Under either theory, a party must demonstrate the following elements:

(1)  there must be no existing, enforceable contract between the parties covering the same subject matter;

(2)  the party seeking recovery must prove that it provided valuable goods and services;

(3)  the party to be charged must have received the goods and services;

(4)  the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

(5)  the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Id.* at 824-25 (internal citations omitted). In their Complaint, Plaintiffs asserted that Defendants had received benefits in connection with the Little Rock Property and stated that it would be unjust for Defendants to retain these benefits without compensating Plaintiffs for the value they received. In support of their request for relief, Plaintiffs alleged that the

value of benefits the Defendants had received in connection with the Little Rock Property was not less than the amount of the additional monthly payments "for each month through and including December 2028."

When the trial court dismissed Plaintiffs' unjust enrichment and quantum meruit claims at summary judgment, it explained its decision as follows:

> Plaintiffs cannot recover under the theories of unjust enrichment/quantum meruit because, among the other elements of these claims, "[a] party seeking to recover on one of these theories must demonstrate . . . [that] there [is] **no** existing, enforceable contract between the parties covering the same subject matter[.]" *Id.* (citation omitted; emphasis added); *accord*, *Doe v. HCA Health Services of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001). The Court finds that the Lease Agreement is an existing, enforceable contract between the parties covering the same subject matter as Plaintiffs' claimed oral agreement. Accordingly, Plaintiffs' unjust enrichment and quantum meruit claims must be dismissed.

For the reasons discussed below, we affirm the trial court's decision to dismiss Plaintiffs' unjust enrichment and quantum meruit claims. Indeed, having reviewed the record transmitted to us on appeal, we conclude that no genuine issue of fact exists with respect to Plaintiffs' request for quasi-contractual relief.

Concerning Defendant Hi-Speed, we observe, like the trial court, that an enforceable contract already exists regarding the same subject matter. Under the written lease agreement that was executed in December 2005, Hi-Speed's obligations with respect to the additional monthly payments are clearly defined. The payments, therein defined as a component of "Additional Rent," were to continue so long as the Thomas Street Property served as collateral. Although Plaintiffs argue that the written lease agreement addresses a different subject matter inasmuch as it does not specifically address the parties' alleged agreements regarding the sale of the Thomas Street Property, we find their arguments to be without merit. The written lease agreement generally addresses, *inter alia*, the consideration that is to be provided in exchange for financing the construction of the Little Rock Property. The fact that it does not cover every element of consideration allegedly agreed to as part of a purported larger agreement does not mean that it does not cover the same subject matter. In any event, as we have already noted, the precise subject matter at issue was unquestionably addressed by the written lease agreement. As Plaintiffs observed in their Complaint, the $4,000.00 monthly payment outlined in the written lease agreement

"is the same $4,000.00 that was to be paid to Plaintiffs [under the "Loan Guaranty Agreement"].[11]

Concerning Defendant Mock, the record does not evidence any genuine factual issue as to whether Mock received any benefit that would justify the enforcement of a quasi-contractual remedy against it. Despite Ms. Smith's affidavit testimony that *both* Defendants agreed to lease the Little Rock Property, there is no evidence in the record that the Little Rock Property was actually constructed for the benefit of Mock. Hi-Speed is the only entity that ever leased the property, and Ms. Smith's decision to sue Mock does not appear to have been factually tied to Mock's own corporate actions. In this vein, we note that there are no asserted facts specifically linking the financing/leasing arrangements to the corporate actions of Mock. As evidenced by Ms. Smith's deposition testimony, she sued Mock because of her perception that it was intertwined with Hi-Speed:

Q.      Hi-Speed, Inc., the Arkansas corporation is the entity that entered into this lease with you for that Lindsey Road property?

A.      Yes.

Q.      Okay, tell me in your own words, why are you asserting in this lawsuit a claim against Mock, Inc., the Tennessee corporation?

[Counsel]: Objection to form.

A.      Because I don't see differences.

Q.      You don't, well, we have seen –

A.      I have seen the documentation but it's all intertwined.

---

[11] It is technically true that Ms. Smith, in her individual capacity, was not a party to the written lease agreement. It is unclear to us, however, how the evidence in the record would support her having an individual claim for unjust enrichment. The actions she took in furtherance of the development of the Little Rock Property are all seemingly connected to her role as trustee of the Trust. For example, although Ms. Smith notes that the Defendants were provided value by way of the *Plaintiffs'* agreement to surrender the Thomas Street Property, that property was owned by the Trust, not Ms. Smith individually. Moreover, although Ms. Smith cites that she incurred personal indebtedness to finance the construction loan for the Little Rock Property, the Little Rock Property itself was also owned by the Trust. The ultimate benefit received by Hi-Speed, the use of the Little Rock Property, is thus tied to value provided by the Trust, not Ms. Smith in an individual capacity. In keeping with this fact, the rent due under the written lease agreement was directed to be paid to the Trust, not Ms. Smith individually.

Q. Okay, from your perspective, it's all intertwined and Hi-Speed -- is Hi-Speed a subsidiary of Mock, Inc.?

A. I don't know.
Q. Well, when you say it's all intertwined, tell me more of what you mean so that I understand why you have sued Mock.

A. Because Mock, Inc. manages and does everything for Hi-Speed, Inc.

Although the record arguably raises a question as to whether Mock could potentially be held liable for Hi-Speed's separate obligations,[12] there is no evidence that Mock itself received any direct benefits. Accordingly, there is no basis in law for the imposition of a quasi-contractual remedy against it.

Count 4- Equitable Estoppel

As another vehicle for extending the duration of the additional monthly payments past the timeframe outlined in the written lease agreement, Plaintiffs have asserted a claim of equitable estoppel. The doctrine of equitable estoppel can be applied when the following elements are present with respect to the party against whom estoppel is asserted:

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;

(2) Intention, or at least expectation that such conduct shall be acted upon by the other party;

(3) Knowledge, actual or constructive of the real facts.

---

[12] In certain cases, parties may establish, "[b]y suitable evidence[,] . . . that separate corporations should be treated as a single entity." *Murroll Gesellschaft M.B.H. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) (citation omitted). Although Ms. Smith's deposition testimony, along with other evidence, arguably raises the question of whether it is appropriate to treat Mock and Hi-Speed as a single entity, this argument was never specifically advanced on appeal. Issues not raised in a brief are considered waived. *See Thompson v. Deutsche Bank Nat'l Trust Co.*, No. W2011-00329-COA-R3-CV, 2012 WL 1980373, at *3 (Tenn. Ct. App. June 4, 2012) (citations omitted) ("[A]n issue that the appellant does not raise or adequately argue in her appellate brief is waived.").

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (citation omitted). Moreover, in order to successfully invoke estoppel, the party relying on it must lack knowledge of the truth of the facts in question, rely on the conduct of the party estopped, and take such action so as to change his or her position prejudicially. *Id.* (citation omitted). For the specific reasons articulated below, we conclude that the trial court did not err in dismissing Plaintiffs' equitable estoppel claim at summary judgment.

Analytically, equitable estoppel is distinguishable from a claim of promissory estoppel. Whereas "promissory estoppel is a sword, based on the failure to deliver on a promise, . . . equitable estoppel is a shield a plaintiff can raise against the defense of the statute of frauds when the defendant has knowingly misrepresented a fact." *Seramur v. Life Care Ctrs. of Am., Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009). "[E]quitable estoppel is not a cause of action, and standing alone it will not entitle the party to affirmative relief." *Deal v. Tatum*, No. M2015-01078-COA-R3-CV, 2016 WL 373265, at *8 (Tenn. Ct. App. Jan. 29, 2016) (citation omitted).

In this case, Plaintiffs asserted an equitable estoppel claim in their original Complaint. They have treated equitable estoppel as a substantive cause of action rather than a doctrine that could remove the bar of the Statute of Frauds. In their initial brief on appeal, for example, Plaintiffs raise arguments as to why an exception to the Statute of Frauds exists, but none of these arguments involve equitable estoppel. As in the Complaint and in the course of the trial proceedings, equitable estoppel is instead treated as a free-standing legal cause of action. Although Plaintiffs' reply brief does state that equitable estoppel is available so as to allow them to overcome the bar imposed by the Statute of Frauds, we have consistently held that arguments not raised in an initial brief are waived. *See Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 220 n.5 (Tenn. Ct. App. 2013) (noting that a reply brief is not a vehicle for raising new issues or arguments).[13] Because equitable estoppel is not a sword that can be asserted as a stand-alone cause of action, the trial court did not err in dismissing Plaintiffs' equitable estoppel count.

#### Count 6- Promissory Estoppel

Plaintiffs also raised a promissory estoppel claim in an attempt to recover additional monthly payments past the timeframe provided in the written lease agreement. The trial court dismissed their promissory estoppel claim at summary judgment, concluding as follows:

---

[13] In any event, we note that claims for equitable estoppel involve representations of existing or past facts to a plaintiff, as opposed to promises of future performance. *Mills v. Mills*, No. W2014-00855-COA-R3-CV, 2015 WL 3883176, at *10 (Tenn. Ct. App. June 24, 2015).

The Tennessee Supreme Court has held that the application of promissory estoppel to overcome the bar of the Statute of Frauds is limited to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship or oppression, verging on actual fraud." *Shedd v. Gaylord Entertainment Co.*, 118 S.W.3d 695, 699-700 (Tenn. Ct. App. 2003), *perm. app. denied*. This is not such an exceptional case. Plaintiffs have not alleged or offered any evidence that they were lied to or misled. To the contrary, Plaintiff Smith testified her dealings were with her son toward whom she apparently has expressed no claim of deceit or misrepresentation.

Having reviewed the record transmitted to us on appeal, we agree with the trial court's decision to dismiss the promissory estoppel claim, albeit for the specific reasons discussed below.

Promissory estoppel "is an equitable doctrine, and its limits are defined by equity and reason." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted). "A claim of promissory estoppel is not dependent upon the existence of an express contract between the parties." *Id.* at 405 (citations omitted). Rather, such a claim will be established when plaintiffs show the following:

(1)     that a promise was made;

(2)     that the promise was unambiguous and not unenforceably vague; and

(3)     that they reasonably relied upon the promise to their detriment.

*Id.* at 404 (citations omitted). The key element, of course, is the promise. *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991). "It is the key because the court must know what induced the plaintiff's action or forbearance[.]" *Id.* Importantly, the promise "must be unambiguous and not unenforceably vague." *Id.* (citations omitted).

In this case, the alleged oral promise does not meet the legal standard outlined above. According to Ms. Smith's affidavit, the alleged promise made by Defendants included the promise to pay Plaintiffs, for twenty years, "a[] monthly amount sufficient to cover all of the required loan payments, plus $4,000 to $5,500 per month." This purported promise is too indefinite to support a basis for relief; the promised payment terms are uncertain, and there is no reference to other facts from which a sense of certainty can be established. Although a defined range is given concerning the amount of additional monthly payments promised to be made, the range itself provides us no basis upon which to bring clarity to the

promise. Does the promise call for a specific amount within the listed range that is to last for the duration of the identified twenty year period? Or can the payment amount vary within the range depending on the specific month? If so, on what basis? Although the relied-upon promise invites these questions, the questions themselves are left unanswered. Because the alleged promise by Defendants is too vague to be enforceable, we affirm the trial court's summary dismissal of the promissory estoppel claim.

*The trial court's findings pertaining to the written lease agreement*

Following the trial court's entry of summary judgment as to the claims discussed above, a trial was held on the Trust's claim for violation of the written lease agreement. This claim was presented in count two of Plaintiffs' Complaint and was predicated on Hi-Speed's alleged failure to pay the full amount of base rent and additional monthly payments due under the lease. In its July 22, 2015 final judgment, the trial court concluded that no deficiency was available to the Trust:

> As of this date, Hi-Speed, Inc. has paid Plaintiff Peggy L. Smith, Trustee of the Peggy L. Smith Trust more rent under the Little Rock Lease than the Court has found it was obligated to pay her under the clear and unambiguous Lease provisions, including specifically the provision at paragraph 3(b)(ii) that an additional $4,000.00 per month was to be paid only "for so long as [the Thomas Street] property shall serve as said additional collateral." Thus, at this time there is no deficiency owed to her by Hi-Speed, Inc. Therefore, she is not entitled to any judgment under Count 2 of her Complaint, or otherwise under any other Count of her Complaint as the Court has previously ruled.

On appeal, the Trust challenges the trial court's determination that it is not entitled to a deficiency. First, it argues that the defense of payment is an affirmative defense that Hi-Speed failed to plead. Second, it argues that Hi-Speed failed to make the "requisite showing" that its rent obligations under the written lease agreement were satisfied.

Although the Trust correctly identifies that "payment" is as an affirmative defense under Rule 8.03 of the Tennessee Rules of Civil Procedure, we disagree that Hi-Speed was required to affirmatively plead "payment" in order to prove that it had, in fact, paid more than it was required to under the lease agreement.[14] In the context of this case, Hi-Speed's

---

[14] Given our opinion on this issue, we do not need to reach a resolution on Hi-Speed's alternative position that it properly pleaded "payment." According to the seventh defense in Hi-Speed's answer, it was "paying a full and fair rental for the [Little Rock Property] to which Plaintiffs contractually agreed[.]" We note that this defense was specifically raised in defense of Plaintiffs' claims for unjust enrichment and quantum meruit.

apparent[15] proof of payment is consistent with a general defense to liability.  As former Tennessee Supreme Court Justice William Koch explained while serving as a judge on this Court:

> The difference between a general defense which is not required to be specifically pled and an affirmative defense is that a general defense negates an element of the plaintiff's prima facie case, while an affirmative defense excuses the defendant's conduct even if the plaintiff is able to establish a prima facie case.

*Brooks v. Davis*, No. 01-A-01-9509-CV00402, 1996 WL 99794, at *7 (Tenn. Ct. App. Mar. 8, 1996) (Koch, J., concurring) (citation omitted).  Although we have not been able to locate any Tennessee authority specifically stating that evidence of "payment" may sometimes be asserted as a general defense notwithstanding the language contained in Rule 8.03, we are of the opinion that such a position is an appropriate one.  If the proof of payment serves to negate a plaintiff's prima facie case rather than excuse it, payment functions as a general defense, not an affirmative one.  In reaching our conclusion on this matter, we are particularly persuaded by the decision of the Missouri Court of Appeals in *Smith v. Thomas*, 210 S.W.3d 241 (Mo. Ct. App. 2006).  At issue in that case was a landlord's claim to recover rent allegedly due under a residential lease.  *Id.* at 242.  After the trial court entered a judgment in favor of the tenants, the landlord appealed.  *Id.* at 243.  Among other issues, the landlord argued that the trial court had erred in considering evidence that the tenants had made all of their rent payments due to their failure to plead payment as an affirmative defense.  *Id.*  The appellate court rejected this argument, stating as follows:

> Payment is one of the affirmative defenses specifically referred to in Rule 55.08 as one that must be included in a responsive pleading.  Appellant contends that Respondents' failure to file a written pleading asserting that defense precluded Respondents from presenting any evidence that they had made the rent payments Appellant claimed not to have received.
>
> The crucial problem with Appellant's argument is that, rather than seeking to establish an affirmative defense, Respondents sought to introduce the challenged evidence in order to negate an element of Appellant's cause of action and to impeach the credibility of Appellant's witness.  "An affirmative defense seeks to defeat or avoid the plaintiff's cause of action, and avers that

---

[15] We say "apparent" because we are unable to discern the totality of the proof presented to the trial court given Plaintiffs' failure to file a transcript of the trial proceedings or prepare a statement of the evidence in accordance with Rule 24 of the Tennessee Rules of Appellate Procedure.

even if the allegations of the petition are taken as true, the plaintiff cannot prevail because there are additional facts that permit the defendant to avoid the legal responsibility alleged." [*Mobley v. Baker*, 72 S.W.3d 251, 257 (Mo. Ct. App. 2002)]; *see also Rice v. James*, 844 S.W.2d 64, 66 (Mo. App. E.D. 1992) (quoting *Parker v. Pine*, 617 S.W.2d 536, 542 (Mo. App. W.D. 1981)) ("'An affirmative defense contemplates additional facts not included in the allegations necessary to support plaintiff's case and avers that plaintiff's theory of liability, even though sustained by the evidence, does not lead to recovery because the affirmative defense allows the defendant to avoid legal responsibility.'"). "'Any evidence which tends to show plaintiff's cause never had legal existence is admissible on a general denial even though the facts are affirmative, if and insofar as they are adduced only to negative the plaintiff's cause of action and are not by way of confession and avoidance.'" *Rice*, 844 S.W.2d at 66 (quoting *Parker*, 617 S.W.2d at 542).

As a part of Appellant's prima facie case, he was required to "establish the existence of a valid lease, mutual obligations arising under the lease, that defendant did not perform, and that plaintiff was thereby damaged by the breach." *TA Realty Assocs. Fund V*, 144 S.W.3d at 347. In his petition, Appellant averred that Respondents had breached the lease by failing to pay rent on several unspecified occasions.

\* \* \* \*

At trial, Appellant presented testimony from the property manager that Respondents had not paid rent in January, February, April, and May 2004 and submitted an accounting ledger that did not reflect payments having been received from Respondents for those months. Respondents' testimony that they had indeed paid their rent for those four months served to impeach Appellant's evidence of their failure to pay rent and to thereby negate the breach element of his cause of action. Accordingly, the trial court did not err in admitting and considering that testimony in assessing whether Appellant proved his cause of action.

*Id.* at 243-44 (internal footnote omitted).

In this case, the trial court determined that Hi-Speed's payments of rent under the written lease agreement resulted in no deficiency. This proof of payment was proper as a general defense because it successfully negated the Trust's prima facie case. With respect to the Trust's argument that Hi-Speed failed to make the "requisite showing" that its rent

obligations were fulfilled, our ability to review this issue has been hampered by the Trust's failure to file a transcript of the trial proceedings or prepare a statement of the evidence. Because we cannot review the facts without an appellate record containing the facts, "we must assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992) (citations omitted). Accordingly, we conclude that no basis exists to disturb the trial court's findings regarding the lack of a deficiency.

## Conclusion

For the foregoing reasons, we affirm the dismissal of the claims by the trial court's February 23, 2015 summary judgment order, as well as its later July 22, 2015 final judgment. Costs of this appeal are assessed jointly and severally against the Appellants Peggy L. Smith and the Peggy L. Smith Trust, and their surety, for which execution may issue if necessary. This case is remanded to the trial court for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE