IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2020 Session

## NATHANIEL HICKS ET AL. v. THOMAS CHEARS ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 17C1453          Amanda Jane McClendon, Judge**

———————————————————

### No. M2019-01428-COA-R3-CV

———————————————————

Property owners sued lessees for possession and back rent. Lessees counterclaimed, alleging anticipatory breach, fraud, unjust enrichment, promissory estoppel, and breach of the duty of good faith and fair dealing in conjunction with a purchase option. Property owners moved for summary judgment on their claim for possession, arguing that lessees never exercised their option to purchase. In response, lessees asserted anticipatory breach. The trial court granted partial summary judgment to property owners. After a bench trial, the court dismissed the remaining counterclaims. On appeal, lessees challenge both decisions. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Nancy K. Corley and James W. Edwards, Hendersonville, Tennessee, for the appellants, Thomas Chears and Geneva Chears.

James B. Johnson, Nashville, Tennessee, for the appellees, Nathaniel Hicks and Lynette Hicks.

# OPINION

## I.

### A.

Thomas and Geneva Chears wanted to buy a house. Nathaniel Hicks had a house on Curdwood Boulevard he was willing to sell. After viewing the property, the Chearses expressed interest in buying, but they lacked both the funds and sufficient credit. So Mr. Hicks suggested a lease with a purchase option.

In October 2007, Mr. Chears gave Mr. Hicks $20,000 in cash as a down payment to purchase the Curdwood property. The receipt, signed by both men, contained the words "depending on paperwork" and "contingent on both parties agreeing." The Chearses met with both Mr. Hicks and his wife, Lynette Hicks, several times before signing a written agreement that specified the purchase terms.

At their fourth meeting, Mr. Hicks gave the Chearses a copy of a form agreement he had obtained at Office Depot. The form was captioned "Lease with Purchase Option." It contained a series of pre-printed terms including a purchase option. The Chearses took the lease form with them at the conclusion of the meeting.

The Chearses and Mr. Hicks later signed two contracts. In one, Mr. Hicks agreed to sell the Curdwood property to the Chearses for $190,000 "as a lease purchase with option to buy." The second contract was a lease with purchase option. Although Mrs. Hicks had an ownership interest in the Curdwood property, she was not a party to either contract. She was present, however, when the contracts were signed and filled in the blanks in the lease form.

The signed lease had a stated term of two years—November 1, 2007, to October 31, 2009—with "the option to extend at lessor discretion." The Chearses agreed to pay $1,600 per month "as rent . . . of which $1,600 shall be applied to [the] downpayment to purchase the premises." The Chearses were responsible for "all maintenance, repairs, and upkeep" on the leased premises. The lease also granted the Chearses the following purchase option:

36. Purchase Option. It is agreed that Lessee shall have the option to purchase real estate known as:_____ _1006 Curdwood Blvd., Nashville, TN 37216_____ for the purchase price of _One hundred ninety thousand_ Dollars ($ _190,000.⁰⁰_ ) with a down payment of _____ _Sixteen hundred_ Dollars ($ _1600.00_ ) payable upon exercise of said purchase option, and with a closing date no later than.___30_____ days thereafter. This purchase option must be exercised in writing no later than _September 1_____ , 20 _09___, but shall not be effective should the Lessee be in default under any terms of this lease or upon any termination of this lease.

2

The Chearses made monthly payments during the lease term, but they never exercised the purchase option. At the conclusion of the lease term, they continued to live on the property and make monthly payments to Mr. Hicks. According to the lease, any holdover by the lessee created "a new month-to-month tenancy" subject to "all the terms and conditions" in the lease.

Two years later, the Hickses and the Chearses met and approved another agreement. Instead of starting anew, they made a copy of the previously signed lease and altered the dates. The new lease term began on November 1, 2011, and ended on October 31, 2013. The deadline for exercising the purchase option was also changed to September 1, 2013. No other alterations were made. No one re-signed the modified agreement. Neither did anyone object.

Once again, the Chearses failed to exercise the purchase option by the deadline. Rather, they continued to make monthly payments both during and after the term specified in the second lease.

Fourteen months after the second lease term expired, the parties met and approved a third lease. Following the same procedure as before, they made a copy of the previous lease and changed the dates. The lease term became January 1, 2015, to December 31, 2019. And the deadline for exercising the purchase option became June 30, 2019. This third, and final, lease also contained an additional provision requiring the Chearses to pay both taxes and insurance on the property. Mr. Chears signed the third lease on January 8, 2015. His wife initialed it. As with the previous leases, the Chearses made monthly payments to Mr. Hicks, but they did not exercise the purchase option.

Mr. Chears began asking Mr. Hicks for a "payoff balance" in 2016. According to the Chearses, Mr. Hicks never gave them a number. More ominously, the Chearses discovered that the Hickses were refinancing the existing mortgage. The refinance increased the debt on the property to $218,500.

In February 2017, the Chearses suspended their monthly payments. Mr. Hicks declared a default and terminated the lease.

B.

The Hickses filed a detainer warrant against the Chearses, seeking both possession and unpaid rent. The Hickses won the first round, and the Chearses appealed for a de novo hearing in circuit court. In a counHickses sought specific performance or damages under a variety of theories, such as anticipatory breach, fraud, and unjust enrichment.

3

The Hickses moved for summary judgment as to their right to possession of the Curdwood property. According to the Hickses, the Chearses never exercised the purchase option before the lease terminated. In response, the Chearses argued that their default should be excused because Mr. Hicks had repudiated the purchase option.

The trial court granted partial summary judgment to the Hickses. The court ruled that the parties had entered into three separate lease agreements, each containing a purchase option. And the Chearses never exercised the purchase option as required in the written agreements. The court also found that Mr. Hicks's conduct did not rise to the level of anticipatory breach.

After the grant of summary judgment, the focus of the litigation shifted to the remaining counterclaims.[1] The Chearses sought damages for fraud, unjust enrichment, promissory estoppel, and breach of the duty of good faith and fair dealing.

At trial, the Chearses claimed that they intended to purchase, not rent, the Curdwood property. They made a $20,000 down payment. And Mr. Hicks agreed to sell them the Curdwood property for $190,000, payable over time. In Mr. Chears's words, the written agreements were "just paperwork." He never fully read any of them or consulted an attorney. Still, he admitted that he probably would have understood the written terms had he bothered to read them.

In late 2016, believing he had paid the purchase price, Mr. Chears asked Mr. Hicks for a payoff balance. Despite multiple requests, Mr. Hicks never gave him one. So Mr. Chears told him he was not going to make any more monthly payments without a payoff figure. He missed two monthly payments before Mr. Hicks declared a default.

Mr. Chears proposed to cure the default by offering Mr. Hicks a third-party check for the amount owed. But the tender was conditioned on a new written agreement. Mr. Chears wanted to replace the original lease agreement with a back-dated real estate contract. Mr. Hicks declined.

Mr. Chears complained that Mr. Hicks had misled him, explaining "[f]rom day one he told me [the house] was mine." And "he had me to pay all the bills." Mr. Chears and his wife invested over $73,000 in permanent improvements to the leased property. They added iron fencing, a concrete driveway, a deck, and a basketball court. They turned an unfinished outbuilding into a game room. And they renovated the home's interior. Mr. Chears claimed he never would have made such improvements had he known that he

---

[1] The court initially dismissed all counterclaims on summary judgment. Later, the court amended its decision. The court clarified that it had granted summary judgment on the Hickses' complaint and the defense of anticipatory breach. And it reserved ruling on the remaining counterclaims until after an evidentiary hearing.

4

was only leasing the property. He never asked for written consent to make the improvements. Still, he claimed that the Hickses were fully aware of the alterations, and they never objected.

Mrs. Chears echoed much of her husband's testimony. She claimed they had been purchasing the Curdwood property since November 2007. Unlike her husband, she had looked over the lease before signing it. But she did not understand it. Yet, she asked no questions. And she admitted no one stopped her from seeking legal advice.

For his part, Mr. Hicks agreed that the Chearses had initially hoped to purchase the Curdwood property. He suggested the lease with purchase option because they lacked sufficient resources to purchase the property in 2007. He gave them an opportunity to look over the proposed lease several days before they finalized the deal. And they both signed it. When they failed to exercise the purchase option during the initial lease term, he gave them two more opportunities in the subsequent leases. But they never exercised the option.

He also agreed that Mr. Chears asked him for a payoff balance. He thought he gave him one.

As for the refinancing, Mr. Hicks explained that the Curdwood property had always been subject to a mortgage. He and his wife first refinanced in late 2007 to avoid a looming balloon payment. And he remembered talking to Mr. Chears about it. Mr. Hicks used payments from the Chearses to make the mortgage payments. But, according to Mr. Hicks, their payments were often late, and Mr. Hicks's lender was threatening foreclosure. So he was forced to refinance with another lender. Although the new mortgage balance exceeded the purchase option amount, Mr. Hicks maintained that he was always willing to honor the purchase option had it been timely exercised.

At the conclusion of the bench trial, the court dismissed the remaining counterclaims. The court found Mr. Hicks to be a credible witness. But Mr. Chears, while "likeable," was "not completely believable."

The court found no proof of fraud. The Chearses were competent adults. They signed the lease with purchase option. They could not now complain that they did not understand it. As Mr. Hicks was not a fiduciary, he had no responsibility to explain the lease terms. And, because Mr. Hicks was acting as his wife's agent, the lack of Mrs. Hicks's signature did not taint the agreement.

For much the same reason, the court determined that the Chearses had not proven a breach of the implied covenant of good faith and fair dealing. And promissory estoppel did not apply on these facts.

The court also ruled that the improvements to the property did not constitute unjust enrichment to the Hickses. The court reasoned that the Chearses could have avoided this forfeiture by simply exercising the purchase option. Still, the court determined that it would be unfair to allow the Hickses to retain the $20,000 down payment under the circumstances. So the court awarded the Chearses a credit against the judgment for unpaid rent.

**II.**

On appeal, the Chearses challenge both the grant of partial summary judgment and the dismissal of their counterclaims after trial. Their issues implicate different standards of appellate review.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. So we review the record and make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763.

Our review of the trial court's factual findings after a bench trial is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13 (d). We give great deference to the trial court's credibility assessments. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). We do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). We review questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

A.

The grant of partial summary judgment turned on interpretation of the parties' written agreements. Contract interpretation is a question of law which we review de novo with no presumption of correctness. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The "cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties" as expressed in the plain language of the contract. *Id.*; *see Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). All the content of the contract must be examined. *D & E Const. Co., v. Robert J. Denley Co.*, 38 S.W.3d 513, 518-19 (Tenn. 2001). This is required "for one clause may modify, limit or illuminate another." *Cocke Cty. Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). And where possible, the language "should be construed harmoniously

to give effect to all provisions and to avoid creating internal conflicts." *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). If the language used is unambiguous, we enforce the contract as written. *Dick Broad. Co.*, 395 S.W.3d at 659; *Allstate Ins. Co.*, 195 S.W.3d at 611.

The parties executed two contracts. The first outlined their agreement in general terms. Mr. Hicks agreed to sell the Curdwood property for $190,000 "as a lease purchase with option to buy." This first contract also specified that the monthly rent would be $1,600. The second contract was a lease with a purchase option.

A purchase option "is a continuing offer to sell irrevocable during the option period." *Jones v. Horner*, 260 S.W.2d 198, 199 (Tenn. Ct. App. 1953). Unlike a contract to purchase real estate, "[a]n option cannot be enforced as a contract until exercised by acceptance." *Pinney v. Tarpley*, 686 S.W.2d 574, 580 (Tenn. Ct. App. 1984). And it is undisputed that the Chearses never exercised the purchase option.

The lease terms defined the parties' rights and responsibilities. The lease had a rent requirement. Contrary to the Chearses' position throughout this litigation, their monthly payments to Mr. Hicks were rent, not down payments toward a purchase. Two lease provisions—the rent requirement and the purchase option—are relevant here. Other than the dates, these provisions remained the same in all three leases. As provided in the third lease,

> Rent. Lessee agrees to pay, without demand, to Lessor as rent for the demised premises the sum of [$1,600] per month in advance on the 1st day of each calendar month [during the lease term] of which [$1,600] shall be applied to Lessee's downpayment to purchase the premises.

> Purchase Option. It is agreed that Lessee shall have the option to purchase real estate known as [the Curdwood property] for the purchase price of [$190,000] with a down payment of [$1,600] payable upon exercise of said purchase option with a closing date no later than 30 days thereafter. This purchase option must be exercised in writing no later than June 30, 2019, but shall not be effective should the Lessee be in default under any terms of this lease or upon any termination of this lease.

The purchase option provision illuminates the meaning of the language used in the rent provision. *See Cocke Cty. Bd. of Highway Comm'rs*, 690 S.W.2d at 237. The Chearses had an option to purchase the property for a specified price. Until they exercised the option, they were obligated to pay $1,600 per month as rent. If they had chosen to exercise the purchase option, one $1,600 payment would have become the down payment. But because they never exercised the option, their monthly payments were rent. *See Wilson*, 929 S.W.2d at 373.

As long as the Chearses complied with the lease terms, they were entitled to possession. But, as the lease also provided,

> If any default is made in the payment of rent, or any part thereof, at the times hereinbefore specified, or if any default is made in the performance of or compliance with any other term or condition hereof, the lease, at the option of Lessor, shall terminate and be forfeited, and Lessor may re-enter the premises and remove all persons therefrom.

The Chearses did not pay rent for February or March 2017. So Mr. Hicks declared a default. And when the Chearses failed to cure the default, he terminated the lease.[2]

With the terms of the agreement in mind, we consider the grant of partial summary judgment. The Chearses argue that the trial court erred in finding that Mr. Hicks's conduct did not rise to the level of anticipatory breach. And they question the court's ruling that the parties entered into three separate lease agreements.

1. Anticipatory Breach

Anticipatory breach is a recognized defense to a breach of contract action. *See Mid-S. Indus., Inc. v. Martin Mach. & Tool, Inc.*, 342 S.W.3d 19, 25-26 (Tenn. Ct. App. 2010). Our courts will find repudiation when one party to the contract has done or said something that "amount[s] to a total and unqualified refusal to perform." *UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007) (quoting *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991)). Repudiation can also be established with proof that a contracting party has performed a "voluntary act which renders the party unable or apparently unable to perform the contract." *Id.* (quoting *Wright*, 832 S.W.2d at 545). In either case, the non-breaching party may choose to "treat the repudiation as an immediate breach by bringing suit or changing position in some way." *Id.*

As proof of repudiation, the Chearses point to Mr. Hicks's failure to provide them with a payoff balance and the December 2016 refinance of the existing mortgage. We agree with the trial court that this conduct does not rise to the level of anticipatory breach. The purchase option included a specified purchase price. Mr. Hicks's failure to provide an unnecessary number does not "amount to a total and unqualified refusal to perform the contract." *Wright*, 832 S.W.2d at 545. And he maintained that he was willing to honor the purchase option.

---

[2] Mr. Chears's subsequent tender did not cure the default because it was contingent on renegotiation of the deal.

8

We reach the same conclusion as to the December 2016 refinance. The Curdwood property had been subject to a mortgage since the Hickses purchased the property in 2005. The Hickses refinanced twice. The initial refinance was in late 2007, and resulted in a mortgage totaling $193,000. The second refinance increased the mortgage debt to $218,500. The Chearses asserted, without proof, that the increased debt on the property rendered the Hickses unable to convey good title. But the only evidence in the record is Mr. Hicks's deposition testimony that he would have paid off the mortgage with other funds had the Chearses exercised the purchase option.

## 2. Lease Renewal

The Chearses also argue that the parties only entered one agreement—the original lease with purchase option. They claim that the other two leases were renewals of the original lease.

When a new lease between the same parties "contains the same terms and conditions as the old lease" and "does not confer any greater obligations or rights than those in the old lease," the new lease may be deemed a renewal of the old lease. *Edwin B. Raskin Co. v. Doric Bldg. Co.*, 821 S.W.2d 948, 951 (Tenn. Ct. App. 1991). Under this test, the 2011 lease could be a renewal. The parties only changed the applicable dates. All other terms remained the same. But the 2015 lease added a new obligation—payment of taxes and insurance—not present in either of the first two lease documents. This added obligation undercuts their argument. *See BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 94 (Tenn. 2012) (concluding that new agreement was not a renewal because it contained additional terms).

Even so, the number of leases is immaterial. Whether the parties entered one lease or two or three, the Chearses' monthly payments were rent because they never exercised the purchase option.

### B.

The Chearses also contend that the court erred in dismissing their remaining counterclaims following the trial. They sought recovery under a variety of theories, including fraud, unjust enrichment, promissory estoppel, and breach of the duty of good faith and fair dealing. The trial court concluded that the Chearses did not meet their burden of proof on any of their remaining claims.

## 1. Fraud

The Chearses argue that the evidence at trial supported an award of damages for fraudulent inducement. A successful fraudulent inducement claim requires proof "that the defendant (1) made a false statement concerning a fact material to the transaction (2) with

knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance." *Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

According to the Chearses, Mr. Hicks promised to sell them the Curdwood property. And he told them it was their house. These statements led them to believe "they had entered into an agreement to purchase the property and that their monthly payments were payments going towards the purchase of the property." So they paid over $197,000 in monthly installments and invested an additional $73,000 in permanent improvements.

We conclude that the Chearses' reliance was not reasonable. *See Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010) (listing relevant factors). "Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach." *Solomon v. First Am. Nat. Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). The Chearses could have uncovered the alleged fraud by simply reading what they signed. *See Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 676 (Tenn. Ct. App. 2007) ("One who signs a contract cannot later plead ignorance of its contents if there was an opportunity to read it before signing."). Mr. Chears admitted that he would have understood the lease terms had he read them. As the court noted, this was an arm's length transaction between competent adults. And there is no evidence that the Hickses engaged in any sort of trickery that precluded the Chearses from discovering the lease terms. *See Teague Bros., Inc. v. Martin & Bayley, Inc.*, 750 S.W.2d 152, 158 (Tenn. Ct. App. 1987) (excusing the failure to read a contract when the failure was induced by trickery).

2. Unjust Enrichment

The Chearses also sought compensation under an unjust enrichment theory. This theory requires proof of three elements: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware of the benefit; and (3) the defendant accepted the benefit "under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966)). The most important element is "that the benefit to the defendant be unjust." *Id.*

The Chearses contend that they significantly improved the Curdwood property believing that they were buying it. And it would be unfair to allow the Hickses to retain the benefit of these permanent improvements. But the lease directly addressed alterations to the property:

> Alterations and Improvements. Lessee shall make no alterations to the
> buildings on the demised premises or construct any buildings or make

10

improvements on the demised premises without the prior written consent of Lessor. All alterations, changes, and improvements built, constructed, or placed on the demised premises by Lessee, with the exception of fixtures removable without damage to the premises and moveable personal property, shall, unless otherwise provided by written agreement between Lessor and Lessee, be the property of Lessor and remain on the demised premises at the expiration or sooner termination of this lease.

And the Chearses never obtained written consent.

Unjust enrichment cannot be used to circumvent the express terms of the lease. *See Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991) (rejecting similar argument). We will not imply a contractual obligation under an unjust enrichment theory when "a valid contract exists on the same subject matter." *Id.*; *see Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480-81 (Tenn. Ct. App. 2016) (dismissing unjust enrichment claim because the written lease agreement addressed the same subject matter).

3. Promissory Estoppel

Promissory estoppel is another quasi-contractual theory of recovery. *Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 211 (Tenn. Ct. App. 1994). To establish promissory estoppel, the Chearses must show an unambiguous promise that is not unenforceably vague, reasonable reliance on the promise, and substantial economic detriment. *See Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982); *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007).

Again, the Chearses sing a familiar refrain. Mr. Hicks promised to sell them the Curdwood property. In reliance on his promise, they made monthly payments for ten years and invested in substantial permanent improvements.

As a general rule, promissory estoppel cannot be used to vary the terms of a valid contract. *See Jones v. BAC Home Loans Servicing, LP*, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at *10 (Tenn. Ct. App. July 12, 2017); *Thomas Energy Corp. v. Caterpillar Fin. Servs. Corp.*, No. E2014-00226-COA-R3-CV, 2014 WL 7366676, at *7 (Tenn. Ct. App. Dec. 26, 2014). The lease gave the Chearses a purchase option, which they never exercised. They cannot use promissory estoppel to override the express terms of the agreement. *Cf. Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 646 (Tenn. Ct. App. 2006) ("To allow Barnes & Robinson to prevail on its claim of promissory estoppel would denigrate the expressly bargained terms it and OneSource agreed upon in the letters of intent.").

4. Breach of the Covenant of Good Faith and Fair Dealing

Tennessee imposes a duty of good faith in the performance of all contracts. *Dick Broad. Co.*, 395 S.W.3d at 660. The duty exists to protect the parties' reasonable contractual expectations and their right to receive the benefits of their bargain. *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 769 (Tenn. Ct. App. 2015). The scope of the duty depends on the individual contract. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996).

The Chearses complain that the Hickses deprived them of the benefit of the agreement by refinancing the existing mortgage, treating their monthly payments as rent, and enforcing the written consent requirement in the lease. Like the trial court, we find no evidence of bad faith here. Refinancing the mortgage did not prevent the Chearses from exercising their purchase option. And the other allegedly bad faith conduct was authorized by the lease. "Performance of a contract according to its terms cannot be characterized as bad faith." *Id.* at 687.

## III.

The evidence on summary judgment did not support a finding of anticipatory breach. Upon termination of the lease, the Hickses were entitled to a judgment of possession as a matter of law. *See* Tenn. R. Civ. P. 56.04. And, because the Chearses failed to prove a right to relief under any of their theories, the court did not err in dismissing their counterclaims after trial. So we affirm.

        _s/ W. Neal McBrayer_____
        W. NEAL MᴄBRAYER, JUDGE